DuNCAN, J.
The value of the property, though considerable, sinks into insignificance, when compared with the importance of the principles involved in this case. We may all feel compassion for the family of this unfortunate debtor,. the earnings of whose long and laborious life may be swept away by one disastrous con-nexion, the continuance of but a few months. Yet a just reflection will satisfy us that an adherence to firm and settled rules will more promote the general welfare, and the happiness of families, than bending to each particular case of hardship. The law’s ought not to be so framed, or so construed as to lead men into temptation, but so that they should be induced, by affection for their families, to tread the sure and beaten track of business, which they understand, rather than to soar aloft in the regions of speculation; and not to venture in specious and hazardous undertakings, of the danger of which they are ignorant: by allowing them, while they are climbing the ladder and their heads grow dizzy, and they find they are falling, to make a feather bed on which they may fall lightly; and, under the plea of affection for their wives and children, take away the beds from under the wives and children of their creditors.
I do not mean to detain the jury by a minute recapitulation of the evidence, nor to examine the result of the accounts between Steel and Mercer, at different periods of the partnership. Certain it is, they failed, and that there is a large deficit. John Steel, either a falling or a fallen man, was appointed, some time in the year ISIS, to the office of an auctioneer. lie was without capital and without credit: to carry on the auction business, in the manner in which it is conducted, required both; and, in an evil hour for himself and his family, Robert Mercer, whose credit was good and his property considerable, acquired by small earnings, great labour, and great economy, was tempted to become his partner. He is represented as a man without any experience, or knowledge to fit him for such a connexion. His personal property you have had some account of — it was considerable. His productive real estate in tbfis city, consisting of houses and lots, was estimated at a sum exceeding twenty thousand dollars.
On the 4th of Jtpril, 181S, articles of partnership were entered into between Steel and Mercer. Steel’s capital was the value of his commission. Mercer was to bring in twenty thousand dollars, ten thousand dollars of which were to be equivalent to Steel’s commission. Nearly contemporaneous with this, on the 27th of Jlpril, Mercer conveyed his real estate to his wife, securing to himself a maintenance thereout for life. This conveyance, though executed, was not acknowledged, delivered, or recorded. As an effective instrument, it cannot operate. A little more than six months had gone round, when, between the 10fh and 15th of No *452 vember, Mercer discovered his danger from this connexion, and communicated to a friend his apprehension of ruin from StéeVs large debts to the firm, if Steel should not recover from his then indisposition. ■ He said Samuel Steel, his partner’s brother, had promised on the arrival of a cargo his brother expected from England, to pay or lessen the balance due to the firm. And, on the 28th of November, 1818, Mercer made the settlement on his wife and two daughters, of all his real estate in the city, by a conveyance to trustees for the use of his wife during life, and then for the use of his two daughters, Mary and Jane Dalzell; and, in case of their death without issue, remainder to his own' right heirs. In December, 1818, the trustees accepted, and on the 25th of March, 1819, this conveyance was recorded. Before the execution of this deed, Steel and Mercer had contracted large debts with Warder and Brothers, Job Thoburn, whom the Bank of Pennsylvania represents, and James C. Thomson, (J. C. Thomson has transferred his debt to the plaintiff:) all of which were unsatisfied. They also contracted subsequent debts to a large amount.
From September, 1819, to March, 1820, judgments were obtained by some of these creditors. Among others, Grants and Stone, whose debt was contracted subsequently to the deed of settlement, obtained a judgment on the 19th of December, 1819, on which a fieri facias issued to December, 1819, and,, among other property, the house and lot in question were levied on and condemned, and, on the 26th of October, 1821, an arrangement was entered into between the judgment creditors, Warder and Brothers, The Bank of Pennsylvania, Bethune and Co., James C. Thomson and Edward Thomson, that the plaintiff should buy in the property at sheriff’s sale for the use of creditors — should carry on a suit, and if it was recovered should sell the property and divide the proceeds, after deducting all charges, rateably, to these judgment creditors. On this execution and levy, a sale was made to Edward Thomson, January 22d, 1822, for two hundred and seventy-five dollars, to whom the sheriff conveyed by deed acknowledged the 19th of Jlugust, In 1819 Steel and Mercer stopped payment, and, on the 25th of Jlugust, 1819, Mercer made a general assignment for the use of his creditors, excluding Warder and Brothers.
Some months previous to this, he had transferred certain shares of stock standing in his name on the books of the Farmers and Mechanics’ Bank, the Schuylkill, Commercial, and Mechanics’ Banks, to his daughters, who afterwards transferred to his general assignees.
On the 9th of March, 1820, Mercer obtained the benefit of the insolvent debtors’ acts, and in November, 1825, Edward Thomson, the plaintiff, failed, and made a general assignment for the benefit of his creditors.
It will be observed, that both plaintiff and defendant draw *453 their title from the same source — the plaintiff, contending, that the post-nuptial settlement made by Robert Mercer, is fraudulent and void as to creditors; while-the defendant contends that it is a bona fide and valid settlement, made and recorded before the judgment on which the sale is made; and that, if it is held to be void, the general assignment for the use of his creditors, being likewise before the judgment, must prevail; and, lastly, if this should fail, Thomson cannot recover the possession, as the title is not now in him, but in his general assignees.
The first question then is — shall the settlement of November SSth, 1819, stand against the sale to the judgment creditors ? And if it is not held to be void, the plaintiff has no foundation to stand upon. The inquiry demands our most attentive consideration. The settling of the facts you will not perhaps find difficult; and although no case has occurred in this state, in which the doctrine of post-nuptial settlements has been considered, I do not think the law of the case one of great difficulty, or one on which the judgment can hesitate. I maybe mistaken in the opinion I have formed; but, if I am, I am very much mistaken; and no party will suffer from the mistake, for I will put the opinion in such a form, as that the whole may undergo a review by the court in bank.
I will endeavour to follow sure guides, and adhere to principles well settled in American courts, and by judges of our country not surpassed in any country—Chief Justice Marshall, in Sexton v. Wheaton, 8 Wheat. 229, Mr. Justice Washington, in Gilman v. Bank of North America, and in Lessee of Ridgway v. Underwood, Whart. Dig. 291. pl. 24, Chief Justice Kent, in Reed v. Livingston, 8 Johns. Ch. 372, and Anderson v. Roberts, 18 Johns. 526, and Chief Justice Spencer; and these eminent men have reviewed all the earlier authorities.
I cannot agree that there is any thing so peculiar to Pennsylvania as to distinguish her from other states, or that their decisions have in them any thing local. The same common law and the same statute law govern — the statutes of Elizabeth have been adopted — they are our own, and for myself, if I were to express my own private opinion, it is, that these decisions have gone to the utmost length allowable in favour of voluntary settlements.
As to the deed being recorded, I do not think it changes the law of the case, for there was no change of possession. If this deed is good, it does not take effect from the recording, but byre-'lation to the date. If it was void, then the recording would not make it good. The cases in New York and the District of Columbia were, where there was a law requiring registry. So there is in parts of England — Middlesex and York are register counties; and I do not know that it has been held to make any difference. The settlement was good on the 28th of November, 1818, or void. If good, the registry in March could not make it better; and, if fraudulent, then the registry could not make it good. The *454 deed, if void, is void at law, and requires not the interposition of a Court of Chancery to set it aside.
It is a conveyance of the absolute power which a man has over his own property, that he may make any disposition of it which does not interfere with the existing rights of others; and such disposition, if it be fair and real, will be valid. The limits on this power are only such as are prescribed by law; and, to allow a man less than this, would be to deny to him the power of disposing of his own, according to his goód will and pleasure. But no man has such a power over his own property as to. defeat his creditors, unless for consideration — which blood is not. The common law, as now understood, would not suffer this, but the statute 13 Elis, eh. 5, declares all deeds in fraud of creditors to be null and void, and subjects the parties to such fraud to certain penalties and forfeitures; and of this statute it has been always said, that it cannot receive too general a construction, or be too much extended in suppression of fraud. Cowp. 434. 8 Rep. 82. 2 405.
The object of the legislature was, to protect creditors from those frauds which are frequently practised by debtors, under the pre-tence of discharging a moral obligation. But the statute anxiously exempts from such imputation the bona fide discharge of a moral duty. It does not therefore'declare all voluntary conveyances, but all fraudulent conveyances to be void; and, whether the conveyance be fraudulent or not, is .declared to depend on the consideration being good and bona fide.
The inquiry is, what shall he deemed a good consideration, and What is intended by requiring in a conveyance such consideration to be bona fide? Blood, natural love, and affection, are good considerations; and a gift on such considerations will prevail, unless it break in upon the rights of others. But if it does break in upon such rights, it is equally clear it ought to be set aside. If therefore a man, being indebted, convey to the use of his wife and children, such conveyance is within the statute, for although the consideration be good, it is not bona fide ; that is, the circumstances of the grantor make it inconsistent with that good faith whieh is due to the creditors.
It is an obvious consequence, that if a man who is indebted conveys away his estate, and defeats the existing debts, this is fraudulent; but it would likewise follow, that if he is not indebted, and makes a voluntary conveyance to a child, without particular evidence or badge of fraud to defeat subsequent creditors, that will be good. But if there be any mark of fraud, or intention to defeat subsequent creditors, that will make it void.
If a man, indebted, were allowed to divest himself of his property, in favour of his wife and children, his creditors would be defrauded; but if a man could not, not being indebted, because by possibility he might afterwards become indebted, it would prevent t>. father from making a provision for his child. But the being in- *455 deb ted is not the only badge of fraud: the transaction may be chargeable with such circumstances, as will raise the presumption of fraud. Among these circumstances, is the gift of conveyance — = a gift, be it of the whole, or the quarter part of a man’s property. Such conveyance would be presumed to be fraudulent, for no man. ean voluntarily divest himself of all, or the most of what he has, without being aware that future creditors will suffer by it.
Now here is not only the fact of actual indebtedness at the time existing, to be defeated if the voluntary settlement stands, but a settlement made when the grantor had engaged in a business which would necessarily involve him in future debts. How far it was divesting himself of the most of what he had, the jury will judge.
I have examined with care, not only the English authorities, but the American decisions, and have come to the following conclusions:
1st. Where there is a voluntary settlement, and indebtedness at the time, and the recovery of these debts is delayed, hindered, or defeated, that such settlement is fraudulent and void, and that the avoidance of it, on account of such indebtedness, lets in the subsequent creditors on thé property to satisfy their debts. If the sale has been made under Warder’s, or Thoburn’s, or James C. Thomson’s judgment, and there were antecedent debts and judgments, it could not be argued but that then the purchaser would hold the property; and that the proceeds of the sale would go in discharge of the judgments, not with relation to whether they were ante-nati or joost-nati debts, but with relation to the time of the judgments, No voluntary post-nuptial settlement was ever permitted to affect an existing debt, and this is the language of all the Cases. And I consider it as an undeniable position, that subsequent creditors are let in, where the settlement was made in contemplation oh future debts; or where it is requisite to interfere, and set aside the settlement in favour of prior creditors; or where the subsequent creditors can impeach the settlement as fraudulent by reason of the prior indebtedness. Chief Justice Spencer, in Anderson v. Roberts, 18 Johns. 526, states it as an undeniable proposition, that the statute of 13 Eliz. protects creditors whose debts accrue subsequent to the fraudulent conveyance, equally as those whose debts were due when it was made, and states that he cannot perceive the least difference between a conveyance to defraud subsequent purchasers, and a conveyance to defraud subsequent creditors. Hence, if the jury find a prior indebtedness, and any of that class of creditors is defeated by the settlement, then my opinion is, that the property conveyed is to be considered as part of the estate of the debtor for the benefit of his creditors. I know of no mid-way. When a statute declares a matter void, it thrusts all to destruction like a tyrant; while the' common law, like a nursing father, makes that void where the fault is, and preserves the rest. And my opinion is, that if the jury find any of these *456 debts due, the whole is thrown into assets, and the subsequent creditorsare let in. This, perhaps, would dispose of the whole case; for I think the principle as well settled as any rule of property can be, and if it has not been settled in this state, it is high time it should be, and that it should be known to be the law of the land.
2d. If the party was in debt at the time, and the debts were not provided for by the settlement, nor secured by mortgage, though the grantor should afterwards mean to discharge, the debts, but made the settlement in contemplation of future debts; then I am of opinion, the settlement is covinous and void.
3d. If the party was not in debt at the time, but made the settlement with a view to future debts, and these debts are connected with the deed of settlement, and with a view to keep the estate in his family, to fence out the debts so contracted and secure the estate to his family, and the jury so find it from the whole circumstances, this is a badge of fraud, and will render the deed inoperative as to such creditors. When I speak of indebtedness, I do not mean that class of small debts for family expenses, or other causes which almost every man occasionally owes. For these I would hold that a conveyance, to a child by a parent in prosperous circumstances, unembarrassed, and if the conveyance be a reasonable provision for a child, leaving sufficient funds unincumbered, for the payment of his debts, but which afterwards were dissipated, would be good. But if the grantor be an embarrassed man, and the gift be an unreasonable one, the bulk of his property, leaving a scanty provision for the payment of his debts, the conveyance will be void. There is a case not cited, which I refer to for its sound sense and just discrimination—Partridge, et Ux. v. Gopp et al., Ambler, 599—where Lord NorthiN&ton decided, that the statute of E'liz. extended to all gifts. Mr. Wilbraham seemed to think the Chancellor laid the position down too largely, that a parent could not then make any present to his child, without its being liable to be taken away by creditors; and therefore asked the Chancellor for the information of the Bar, whether he did not mean to confine it to the circumstances of the case? to which the Chancellor answered, that a fraudulent intent is to be collected from the magnitude and value of the gift. So here it is for the jury’s consideration, and worthy of all their consideration, whether this was or not a settlement so unusual, so unreasonable, as that its very magnitude and extent convince them that it was not a bona fide transaction ■ — a transaction in good faith, while the grantor was already indebted, and carrying on a business which would notoriously involve him in future debts.
In my mind it is a strong badge of fraud, when a man embarks in a perilous adventure in which he has already involved himself in debt, and which, from its very nature, must involve him in future debts, for such a man to settle the bulk of his estate on his *457 ■wife and children. And where a man makes a first imperfect deed of settlement before debts are contracted, and a few days after-wards engages in an untried, unknown, hazardous business with a falling man, and where the debts are contracted immediately af-terwards, it is strong ground of suspicion; but it is stronger and ranker still, if, before he completes the settlement, he does it understanding and believing that these debts will bring ruin on his fortune, and under that apprehension makes the settlement, and goes on plunging himself deeper and deeper in debt: and if, from all these circumstances, the jury find this to exist in this case, fraud is to be inferred. This does not trench on the general doctrine, that a voluntary conveyance by a man, not indebted at the time, to his child, if it be a real, bona fide act, is valid. But I cannot think that a conveyance of a man’s whole real estate, or what forms so great a portion of all he is worth, to his wife and children, if it has an eye to future debts, and is made in anticipation of ruin, and to put his family out of danger, though it endangers his creditors, and that anticipation turns out to be a just one, and the subsequent creditors are defeated of their just debts by this provision, is a bona fide conveyance. If circumstances show there was an intention to defeat such future contemplated debts, that a provision for wife and children shall stand against such creditors, cannot be the law. I think this principle is fairly to be deduced from Sexton v. Wheaton, 8 Wheat. 229, where Chief Justice MARSHALL decided that a post-nuptial settlement on a wife and children, by a man who was not indebted at the time, was valid against subsequent creditors, and that the statute does not apply to subsequent creditors, if the conveyance be not made with a fraudulent intent. What circumstances will prove such fraudulent intent, is for the jury; but it is the duty of the court to instruct the jury from what circumstances they may infer it. And, in that case, the Chief Justice purged it of all fraudulent matter, and, in order to do so, laid great stress on the fact that it appeared — at the date of the execution of the deed, the grantor had no view to trade, and that although his failure toas not very remote from the date of the deed, yet the debts and the deed could, in no manner be connected with each other; they were as distinct as if they were a century apart. What was said by Washington, J., in Ridgway v. Underwood, has a strong application to the present case. “ If the grantor incur debts immediately, or so soon afterwards as to warrant a presumption, thjit the conveyance was made in contemplation of such future indebtedness, fraud may be inferred.” How is the case here? Do you believe that the settlement was made with a view to the danger of the trade in which he was engaged ? Do you believe there is a connexion between the debts and the settlement; and that this settlement was made to fence out the debts existing, as well as those which after-wards might be incurred ? If you do, then this is evidence of a *458 fraudulent intent; a look-out for breakers; a desire to provide for his wife and children, while he endangered his safety, — let what would befal bis creditors.
In case of prior indebtedness, that circumstance raises a suspicion of fraud, which may be repelled as to subsequent creditors, by showing that they are provided for by the settlement or secured by mortgage. Subsequent creditors may impeach the settlement, by showing antecedent debts sufficient to afford evidence of a fraudulent intent. For, as on the one hand, an antecedent debt, however small or trifling, is not sufficient to make the settlement void as to others; so, on the other hand, th'e subsequent creditor is not obliged to prove that the party was absolutely insolvent.
If one fact is found by the jury — debts to a considerable amount before the settlement — no provision for the payment of those debts, and that the settlement would defeat their recovery; — it will relieve them from all further investigation; for the law making the settlement void as to the antecedent debts, lets in the subsequent creditors on the estate conveyed. If the settlement is void as to one set of creditors, it is void as to all.
If the jury, for any of these reasons, find the settlement fraudulent, then my present opinion is, that the plaintiff is entitled to recover, notwithstanding the subsequent general assignment. It is, however, in some degree, a new question, and has presented difficulties; but I lay down this as the law. As to the creditors, the fraudulent assignment is void, but the estate does not revest in the grantor. It is good as against him, and all claiming under him. The estate was out of him, except quoad the creditors. The grant cannot be repealed by him, the property passed from him; whoever else it wras in, it was not in him. If this, instead of an ejectment, had been a bill in chancery, and the chancellor had decreed the settlement void as to the creditors, the general creditors would come in on the estate; but judgment ci-editors would come inffrst, aceoi’ding to the priority of their judgments. A creditor, with us, has no other mode of testing the validity of the settlement than by sale on execution. The general assignees do not stand as purchasers for a valuable consideration from the grantoi-. I think the grantor had nothing to convey, nor any power over the premises. He had no jus disponendi.
There can be no doubt but a purchaser at sheriff’s sale under a judgment, is entitled to all the benefit of the statute against fraudulent conveyances. It is very different from a case of bankruptcy, for there the estate vests in the assignees by relation from the act of banki-uptcy, which is the fraudulent conveyance, and therefore it is responsible to the whole body of creditors. They can impeach transactions, which the bankrupt himself could not. Nor do the cases in the Chancery Reports pi-ove any thing. It is cei-tain, that a subsequent voluntary conveyance for the use of creditoi-s, will prevail over an assignment purely voluntary.’ This appears to me *459 ©tight to be the law and reason of the thing; — but it is supported by direct authority. In Anderson v. Roberts, before referred to, Chief Justice Spencek remarks, “ What becomes of the estate, and in whom is it vested, after a conveyance made to defeat existing creditors, or those who became creditors subsequent to the fraudulent conveyance ? As against the grantor the conveyance is effectual. Subsequent creditors having no debts due at the time, the possibility of their having debts cannot prevent the conveyance from taking effect. Those creditors whose debts are due, if they have obtained judgment, and acquired a lien, have gained no vested interest in the land, and they may be paid without resort to the land fraudulently conveyed. The fee is not in any one, and the inevitable conclusion 'is, that the legal title has vested in the fraudulent trustee, subject to be divested, if the creditors see fit to call in question the fraudulent conveyance, and, after the creditor has prevailed, to take in execution the land thus fraudulently conveyed.” The estate is not void, the conveyance is notan absolute nullity, for no deed can be pronounced utterly void in a legal sense, which is valid as to some purpose — but voidable — voidable by the creditors — voidable by proceeding to judgment and sale, but not voidable by the grantor himself. The grantor could not avoid it by his own voluntary act.
I think there is sure foothold here, without having recourse to the intention of the grantor in making the general assignment, and the assignees have never claimed it by that assignment, and never took any measures to avoid the settlement.
As to the objection with respect to the sacrifice of property and the hardship on other creditors, who do not come in for any thing on the sale, it comes with an ill grace from those claiming under a void settlement, to complain of a sacrifice occasioned by the cloud on the title proceeding from their own act. And, as to the creditors, who have not pursued their claims and do not come in, it is their own neglect: they have not taken legal measures to recover the debts, and there is no peculiar hardship, but a loss arising from their own want of vigilance and attention to their own concerns.
Nor do I think the situation of Mercer, as to those debts contracted by his partner in bad faith and against express stipulation, can affect either the creditors or the purchaser at sheriff’s sale. The honesty of a partner is a risk every man runs who enters into partnership, and which has ruined many. It may have been a reason with Mercer to secure his property from some debts, — it is some palliation in a moral view, but is no justification. These debts cannot be questioned in this action. They were reduced to judgments; they are the debts of Mercer, for the payment of which his property was bound by the judgments. We have nothing to do with either his knowledge or ignorance of these debts.
As to the effect of the plaintiff’s general assignment for the use *460 of his creditors on the eve of the trial, it would have been more difficult to raise the objection as to his right to recover the possession, in a country where there was a court of chancery; but here ejectment may be brought by cestui que trust, or he may use the name of his trustee. If he uses the name of his trustee, our courts would not suffer him to discontinue or release; but courts of common law do not in other countries discuss or decide on equitable titles, — here we always do. I doubt, however, whether in a court of common law, they would suffer a mere nominal party to discontinue or release. I think they would protect the cestui que trust’s interest, so as to prevent the nominal party from executing a release. They will not suffer a nominal lessee, in an action for mesne profits, after recovery in ejectment to release.
Edward Thomson was trustee for a particular purpose, to buy in at sheriff’s sale, to prosecute the suit at the joint expense of the judgment creditors, to sell the property, if recovered, and divide the proceeds among the judgment creditors rateably. He was not a tenant in common of any part of the property; he was a trustee for the whole, and he would continue a trustee until the purposes of the trust were answered. A conveyance or lease would be a breach of his trust; and here, where we have no court of chancery to enjoin a trustee from violating his trust, or prevent a violation of the trust from being set up, ex necessitate, courts of justice ought not to suffer this assignment to be set up, to defeat the very design of the trust. Where the ancient practice is resorted to, and the plaintiff in ejectment is a real person, the court will not permit him to release the action for mesne profits, should the, lessor bring the action in his name. Close’s Case, Skin. 247.
In addition to this, the general assignment could only relate to his own estates, which he held in his own right; and, in this casé, the property not being specifically granted, the general words may be satisfied with that construction, they may be explained by the particular occasion or by special recitals. Nor do I think the assignment stands in the way of all that interest which would ac-' crue to Thomson’s assignees, on the recovery and sale of the property.
I think this general assignment no more affects the right to recover in the present action, than an assignment under the insolvent debtor’s acts, where the assignment is in terms as general as the present, and when the insolvent debtor is a trustee. I put a case to illustrate this: — If a man had devised to his executor his land to sell and pay the money over to certain persons, — among whom was the executor-, — I do not think that a general assignment, after action brought, would vest the title so far in his assignees, as that it would prevent a recovery of the possession in his name. This matter may be considered and determined in bank, as, at all events, the plaintiff, if the settlement is judged fraudulent, would be entitled to a judgment for nominal damrges and costa.
*461 I have thus given an opinion on all the legal questions, with as much precision as possible. I have met them all, and decided them according to my best judgment; and, with these instructions, this momentous question is committed to you. It will be your duty to meet it with firmness, and I am confident it will be decided without partiality.
The doctrine I have advanced is not aristocratic. It is the doctrine of sound policy and of common sense, as well as the doctrine of the law. The contrary doctrine would destroy all credit, and would bring down the rich man and not suffer the poor man to rise. It was a saying of a sage of the law, worthy of all commendation, applicable to all nations, and at all times, that “ courts of justice ought not to steal leather to make poor men shoes." It is not aristocratic, because it protects the butcher and the baker, the tailor and the shoemaker, the men who fed and clothed the debtor and his wife and family, from a voluntary settlement by the debtor on that wife and family; a class of creditors as likely to fall victims to an over-indulgent allowance to family settlements as the wealthy trader.
Verdict for the plaintiff