## NATHANIEL WILLIAMS and others *vs.* DANIEL B. BANKS and others.

Where a voluntary deed or settlement, unaffected by *fraud, in fact,* at the time of its execution, is set aside at the suit of *antecedent* creditors, *subsequent* creditors *cannot be let in* to participate in the distribution of the fund; otherwise where there is *fraud in fact.*

The *registration laws* of this State were designed to give, and do give, *notice* which is *binding* upon *all the world,* and a person who, at the time of becoming a creditor, is aware of the existence of a deed, cannot, in any just sense, be considered as "disturbed, hindered, delayed or defrauded" by it.

Indebtment, at the time of a voluntary deed, is *prima facie,* not *conclusive,* evidence of fraud, even as regards a *prior creditor,* yet the *onus* is thereby cast on the grantee to show by evidence, which leaves no *reasonable doubt* on the subject, that the donor, at the time of the gift, was in prosperous circumstances, possessed of *ample means* to pay all his debts, and that the settlement was a *reasonable provision* according to the child's station and condition in life,

The *endorser* of a promissory note which had been protested, is *not a competent witness* to prove the note as a claim to be used for the purpose of setting aside a voluntary deed made by the maker, because his evidence would assist in creating a fund, or in rendering property liable for the payment of the note, which he, as endorser, would otherwise have to pay.

The *purchase* of an *accommodation* note, by a third party, from the *payee,* made nearly three years after the *note fell due,* and for more than $600 less than the face of it, is *usury,* and under the act of 1845, ch. 352, the *purchaser* can only recover against the *maker* the amount he actually paid *for it.*

A mutual exchange of notes will amount to a sufficient consideration for the notes so given, but to do so it must appear that it was the *intention* of the parties to make a mutual exchange of paper, and whether such was their design will depend upon the particular circumstances of each case.

The plea of limitations, set up in the answer to a general creditors' bill, has no effect upon claims *coming in subsequently*; to affect such claims *exceptions*, relying upon the *statute*, must be filed thereto.

In a suit by the endorser against the maker, upon an accommodation note endorsed by the payee when *over-due*, the maker cannot *set-off* a note given to him by the payee.

Accommodation notes dated *prior* to, but not *negotiated* till *after*, the execution of a voluntary deed by the maker, and *after maturity*, are still to be regarded as *antecedent* debts, when the question is, whether the deed is void as against creditors; limitations begin to run on such notes from their *maturity*, no matter *when discounted*.

An accommodation note, though it creates no liability from the maker to the payee, still imposes on the former a *contingent liability* to whoever may become endorsee thereof for value, which liability is rendered *absolute* by discounting the note, and as between the maker and endorsee is a valid claim *from its date*.

If a voluntary conveyance is made with a view or expectation of becoming subsequently indebted, and in accordance with such view or expectation debts are contracted, those who thus become creditors may avoid the deed, although their claims had not, at its date, even a contingent existence.

An indebtedness amounting to $4000 at the date of a *voluntary deed* is sufficient to avoid such a conveyance, the grantor having retained for the payment of her debts only a *life-estate* in property, the *annual value* of which but little *exceeded the claims*, and she being at the time over *ninety years of age*.

Appeal from the Circuit Court for Baltimore city.

The bill in this case was filed on the 1st of December 1853, by the appellants, in behalf of themselves and all other creditors of Hannah Kitty Chase, late of Baltimore city, deceased, who will come in and contribute to the expense of the suit, for the purpose of setting aside a deed of trust executed by the said Hannah to Nathaniel and Joseph B. Williams, on the 2nd of August 1844. The bill asks to have this deed declared fraudulent, null and void, as against her creditors, who were such at the time of its execution, as well as against all her subsequent creditors, because it was made by her with intent to hinder, delay and defraud her said creditors, and to shield her estate against liability for debts which she owed at the time of its execution, and others which she might thereafter contract.

The provisions and trusts of this deed, and the property conveyed by it, are fully stated in the opinion of *Justice Ec-*

*cleston,* delivered in this case. Mrs. Chase, at the time of executing this deed, was over *ninety years* of age, but *fully competent* to execute it, and the debts which she *then* owed, and those which she *afterwards* contracted, were all, except a small amount, contracted by her on account of her grandson, William Chase Barney. The complainants, and the creditors who came in and were made parties to the proceedings, were all, with few exceptions and for small amounts, holders of her notes and obligations issued to her grandson, and used by him for the purpose of raising money.

The answers of the trustees and executors of Mrs. Chase, and the *cestui que trusts* under the deed, aver that the deed was executed by her under the suggestions and advice of judicious friends, for the honest purpose of securing, beyond the power of revocation, the disposition of her property already provided and settled by her will and codicils; that she was advanced in years, and exposed to the persuasions and influences of interested persons, and that her object was to protect herself and her property; that she retained a life estate in the property, and that the legal effect of the deed was to secure the title of the property, according to the uses of the deed, beyond her power to alter or recall it. They charge that the notes appearing to have been dated before the deed were *ante-dated;* that Mrs. Chase received no value for any of them, and that this was known to the complainants when they received them; that all these notes were loaned to William Chase Barney without any valuable consideration, and were by him passed to the complainants when *over-due,* on usurious terms, and are null and void; that the notes were intended to secure usurious loans, and that all this was known to the complainants. They also plead and rely upon the statute of limitations of three years before the filing of the bill, as a bar to the claims set up in the bill.

The *proof* in the cause, on the part of the *complainants,* so far as the *antecedent* claims are concerned, is fully stated in the opinion of *Justice Eccleston.* The *subsequent* debts amounting to a *very large sum,* consisted mostly of promissory notes drawn by Mrs. Chase in favor of William Chase Barney, and

endorsed. These notes bear date the 15th, 24th and 25th of January 1845, payable at various times from three months to four years, and were held by the complainant, Banks. The few other subsequent debts consist of several judgments against Mrs. Chase recovered subsequently to the date of the deed. The complainants proved the signature of Mrs. Chase to each of these notes, and the endorsements of William C. Barney thereon, and also offered in evidence a paper written and signed by Mrs. Chase, on the 30th of December 1847, and attested by her daughter, *Mrs. Barney*, and her granddaughter, *Mrs. Oldfield*, in which she gives a list of some of the notes of the 24th and 25th of January 1845, with the dates at which they are payable, and says, that she gave these notes to her grandson, William Chase Barney, in January 1845, and that they are now held by Daniel B. Banks, "nearly matured, the last of them will fall due in next January. Mr. Banks is my largest and principal creditor, and as he has acted kind and generous towards me, I am anxious he should have as little trouble as possible in getting his claims." In the same paper she also expresses a wish that part of her property may be sold in order that her debts may be paid during her life, her estate settled and she be in possession of her income. They also offered in evidence the inventory of her personal estate and *list of debts* due her at her decease, in order to show that such personal estate, in the hands of her executors, was insufficient to pay her debts. Among the *list of debts* so offered in evidence is the following:

"William Chase Barney appears, by his note, bearing date the 30th of July 1844, and payable in twelve months thereafter, for $4000, to be indebted to her, at that date, for that amount. How much he has become since indebted the undersigned (the executors) are not informed. Any claims on this party are deemed desperate. By a paper called a codicil, dated the 14th of August 1846, the deceased endeavors to release the said William from all claims she or her estate may have against him."

On the part of the *defendants* it was shown, that on the 28th of January 1845, Mrs. Chase conveyed all her estate,

real, personal and mixed, to William A. Talbott, "in trust during the natural life of the said Hannah Kitty Chase, to collect and receive the rents, dividends, issues and profits, arising or accruing, or becoming due upon, from or by said estate; and the same rents, dividends, issues and profits when collected, to apply *first* to the payment of all debts now due and owing and becoming due by her, with a reasonable compensation to said William A. Talbott for the same, and *after* the payment of all said debts to apply said rents, dividends and profits to the proper use of her, the said Hannah Kitty Chase, and as she may, in writing, direct, after such rents, issues, dividends and profits, so to be applied, shall have been collected and received by said trustee, and from and immediately after the death of the said Hannah Kitty Chase, then in trust, as to the whole of said estate and property above conveyed, for the uses, ends, intents and purposes set out and declared in the last will and testament of her, the said Hannah Kitty Chase, and the several codicils thereto, heretofore executed by her and specially referred to and mentioned in a deed of trust from said Hannah to Nathaniel and Joseph B. Williams, which deed bears date on the second day of August 1844, and is recorded," &c.; and that on the 14th of September 1844, Mrs. Chase conveyed certain ground-rents to John Morris to hold and receive the same until he should be paid a debt due by her to him of $2250, with interest from the 9th of August 1844.

*Talbott*, the trustee, proves this deed, that he accepted the trust, received a large sum under it, including the ground-rents previously conveyed to Morris, after his debt had been paid, the most of which he had distributed to her creditors under an equity proceeding in Baltimore county court. A list of creditors to whom he distributed is given, which, with the admissions and agreement of the parties in relation thereto, is sufficiently stated in the opinion of *Justice Eccleston*. The defendants then examined *Mrs. Mary Barney*, the daughter of Mrs. Chase and mother of William Chase Barney, *Mrs. Catharine Chase Oldfield*, the granddaughter of Mrs. Chase and sister of William Chase Barney, *William A. Talbott* and *George W. Dobbin.* The testimony of these witnesses may thus be stated:

1st. As to the execution of the deed of the 2nd of August 1844, the age and mental and physical condition of Mrs. Chase at that period, the motives for the deed and the extent of her property at that time:—*Mrs. Barney* says, that Mrs. Chase died on the 2nd of March 1848, and was about *ninety-seven* years old at the time of her death; that in August 1844, her mind was sound and she was very capable of transacting business, though her memory was weak; in July 1845 she had a severe illness and her health declined rapidly, and then she was not so firm as she had been, but became credulous, and you could persuade her to anything; that after July 1845 her health was better at times and she occasionally went about and visited at the offices of her counsel; the year before her death she became unable to collect her rents personally and got witness to do it; that on the 2nd of August 1844 she owned ground-rents to at least $3000 or $4000 per annum, a life-estate in the house she lived in, "Newington," a tract of about eight acres, in fee; that she had owned a good deal of bank and other stocks, but had parted with them before that period, and had then very little personal property, only some little furniture which sold at her death for about $300. *Mrs. Oldfield's* testimony on this subject is substantially the same. *Talbott* proves that her mental and bodily health were, at that time, remarkably vigorous for one of her years; that he was absent when the deed was executed and has no personal knowledge thereof. *Dobbin* testified as to her competency and vigorous state of health, both of body and mind, at the time; that her motive in executing the deed was to keep her estate out of danger of being wasted by the influence exercised over her by her grandson, William Chase Barney; that it was prepared under his advice, he and Talbott being her counsel; that the reservation of the life-estate proceeded from an indisposition on her part to dispossess herself of her entire estate and the control of the rents, issues and profits as long as she lived, but witness has no recollection of the particulars of the conference with her which led to the drawing and execution of the deed. Neither of these two last witnesses knows anything of the value of the life-estate reserved by the deed.

2nd. As to the influence possessed and exercised by William Chase Barney over his grandmother, Mrs. Chase, the extent and character of this influence, and the knowledge of it by Banks or other creditors:—*Mrs. Barney* says, that his grandmother educated the said William and took care of him; that he lived with her nearly a year until some time in 1844 or 1845, when he went to house-keeping; that in the opinion of his grandmother he was everything to her; he held the most unbounded influence over her, could persuade her at any time to part with her money, which no human being could do but himself, he resorted to every means to obtain her property, and could do anything with her; that his grandmother has often told witness that he did exert an undue and improper influence over her, and said William has told witness he could do as he pleased with his grandmother; he has told witness he could give his grandmother a five-penny bit and get a hundred dollars from her; he has told witness he would show her he could get money from his grandmother, and he would then go into her room and come out with his hands full of money; that his grandmother was too weak to resist him, she would cry and tell witness she had parted with property to him and that she would not do it again; he was the only one who could get money from her, and when witness opposed it he would take her in a hack and carry her away to the bank and obtain it from her; he used his influence to get her money and then squandered what he got; he obtained from her nearly all her income and stocks, and when that was insufficient he got her to give notes to the amount of a thousand dollars perhaps; witness has seen and heard of notes to the amount of $10,000 which she had given him; witness here means the notes that were shown her in the court house, and of which she had no knowledge until they were thus shown her; that he did not own a dollar in the world, or any property, nor had he any occupation, except to raise the wind; he often boasted to witness that he spent $8000 a year; that when he would get from his grandmother a hundred or five hundred dollars he would slip into her hand five or ten dollars of her own money, and she would be delighted and say what a generous fellow he

was, and consider it as if it were a gift to her; he never gave her anything of his own in consideration of what she gave him, and in fact he had nothing to give; that the means he used to obtain money from her were persuasion, the influence he had over her, the complete possession of her affections; that she used to cry bitterly after she had given him the money, and complain to witness.

*Mrs. Oldfield* says on this subject, that said William was an inmate of Mrs. Chase's family off and on just as he visited Baltimore; that Mrs. Chase was always very fond of him; she had educated him; he would coax her and she would do as he wished, and used to say that he employed animal magnetism with her; she was so angry sometimes that she would not speak to him, and he would go up and speak soothingly to her, and she would then show great kindness to him; he certainly used the influence he had over her, and witness thinks it was an undue influence and she was too weak to resist him, if you call it an undue influence when persons say they won't do a thing and you coax them out of it; witness has seen him coax her out of her money in that manner, and has heard of notes being given which witness presumes were got in the same way; that Mrs. Chase had a piece of property called "Newington," which, in her will, she had given to her two grandsons, Samuel and the said William, and on the marriage of Samuel witness induced her grandmother to give him a deed of his half, and asked her at the same time to give one also to William for his half, but she resisted this until witness told her that William would give her some notes of hers that he held, amounting to two or three thousand dollars, when she consented, and the deeds were then drawn by William himself, and he read his own deed to his grandmother, witness holding that to Samuel, and both deeds read alike, except the names of the grantees, and each conveyed one-half of "Newington," and were executed in presence of witness, that to Samuel being executed first, and were acknowledged, but when William's deed went on record it was for the whole tract of "Newington;" that he obtained many promissory notes from his grandmother, but witness cannot tell the amount; on

one occasion he gave witness about $12,000 of such notes to take care of for him; witness has heard him say he had got $40,000 or $50,000 from her, besides spending her income; that he was, at one time, for a short period, an engineer, but even then he always got money from his grandmother, and while in Baltimore he had no money but what he got from her; witness does not recollect that he ever gave her any consideration for the money, notes or property he got from her, except that he once told witness he had given her his own notes for some money she had given him. On cross-examination this witness, in answer to the interrogatory: "Do you know of certain promissory notes issued by Mrs. Chase to the order of Wm. C. Barney, and which you and your mother, Mrs. Mary Barney, advised Daniel B. Banks to purchase, for the purpose of being the sole creditor of Mrs. Chase, and to keep the notes off the street?" said, that William C. Barney had some notes of Mrs. Chase for two or three thousand dollars; he put them in the market and could get very little for them, as Mr. Talbott cried them down; he applied to Mr. Banks to take them, and Mr. Earhart called up to know if witness and her mother, (Mrs. Mary Barney,) approved of Mr. Banks taking them; a note was written by witness and signed by Mrs. Mary Barney and witness, saying that they would prefer Mr. Banks' taking them, as he, (Mr. Banks,) had other notes, and they would prefer there being but one creditor.

*Talbott* testified on this point, that William C. Barney had great control over his grandmother, who seemed to be very much afraid and at the same time very fond of him, but whether he exercised that influence to obtain notes from her, for his own purposes, witness does not know, it was never so exercised in the presence of witness; that he had acquired, and did exert, before the execution of this deed, and from thence to her death, an extraordinary influence over her understanding; it seemed partly fear and partly affection; witness would not say she was too weak to resist, because she resisted all other influences from others, but she did not resist his, and by means of it he certainly did obtain large amounts

Williams, *et al.*, *vs.* Banks, *et al.*

of money, property and promissory notes, the amounts of which witness does not remember, but his recollection is that that it was very large; witness' knowledge is derived from Mrs. Chase and the said William, and partly from his own observation; witness frequently remonstrated with her, and invariably received an assurance, either that she had not done so in the particular instance, or that she would not do so again; that Banks, and witness presumes most, if not all, her creditors knew of this influence; it was matter of general notoriety and conversation among all parties who knew her; whether or not they, or any of them, knew of the want of considerations for the notes held by said William, witness cannot say; witness does not know of said William's getting possession of and selling her stock; he was then utterly insolvent, and had been so long before, and witness believes has been so ever since.

*Dobbin* testifies that said William had acquired, and did exert, about the time of the execution of this deed, before and afterwards, an undue influence over the will and understanding of Mrs. Chase, which she was too weak to resist, and did thereby obtain property, money and promissory notes from her, the exact amount of which witness does not know, but thinks it exceeded $15,000, and went perhaps to $25,000; that witness has reason to believe, from the conversations he held with Mr. Banks in relation to the transactions between Barney and Mrs. Chase, that Banks did know the influence exercised by Barney over her in all the transactions to which they were parties; witness does not know whether Banks, or any of the other creditors, knew of the want of consideration, or of the nature of the consideration, of the particular notes enquired about, held by said Barney; witness knows that Barney got possession of and sold most of the stocks of Mrs. Chase, but what he did with the proceeds he does not know; witness believes that Barney was entirely insolvent ever since witness has known him, which was long before the date of the deed.

3rd. As to the mode of living, habits and expenses of Mrs. Chase:—*Mrs. Barney* says, she thinks her mother did not

spend $200 a year, she kept but one servant and was remarkably parsimonious; *Mrs. Oldfield*, that the amount allowed by Mr. Talbott, and expended for the subsistence of Mrs. Chase, was $5 per week while witness lived there; she was of a very economical disposition and spent very little, though witness thinks she had formerly spent more than that; *Talbott*, that at the time the deed was executed her habits and disposition were exceedingly saving and penurious; witness does not know the amount of the expenses of her household and personal subsistence, but from constantly seeing her at home and elsewhere, he judges they did not exceed $150 a year; that when witness acted as trustee, under the deed of the 28th of January 1845, there was no regular allowance to her, but the creditors gave witness permission to spend such sums as he thought necessary for her support; *Dobbin*, that her habits, as to her personal expenses, were of the most penurious character; witness does not know the amount expended by her, but should put it at the smallest sum capable of sustaining life.

4th. As to the knowledge of the several deeds referred to in the record, or either of them, by Banks or any of the creditors:—*Mrs. Barney* says, that Banks knew of the deed of the 2nd of August 1844, in August or September 1845; *Mrs. Oldfield*, that Banks knew of its existence but she cannot fix the date of his first knowledge; *Dobbin*, that he thinks Banks had knowledge of both deeds soon after they were executed, but he does not think he had before; that Banks claimed as a creditor under the deed to Talbott, and received a dividend, but the amount witness does not know; he also say he does not think the defendants or any of them had any knowledge or notice of the August deed, at the time of its execution; *Talbott*, that he believes Banks had knowledge of both deeds soon after they were executed; that under the deed to witness Banks preferred a large majority in value of the whole claims preferred.

5th. *Talbott* further proved, that at the time the deed of trust was executed to witness, he could discover, after inquiry, but three notes of Mrs. Chase, amounting to about $1300 or

$1500; some months afterwards other notes made their appearance, and from time to time they increased until the debts exhibited amounted to over $10,000, as appears from the auditor's statement in the equity case referred to, and as he expected to find but $1300 or $1500, the excess of course was beyond his calculation; witness suspected and said that these notes were ante-dated, but had of course no actual knowledge of the fact, he inferred it from the facts above mentioned; that whether these notes so presented for distributive shares to witness were ante-dated or not, witness does not know of his own knowledge, and could only give his suspicions; witness cannot say for whom the debts so presented were contracted, but Mrs. Chase certainly had no use for such large sums of money, and it is just as certain she did not use them, and witness does not therefore believe they were contracted on her account; the notes, for the most part, were, as he now recollects, payable to the order of William C. Barney, and witness always thought they were obtained by him from Mrs. Chase without consideration; that he thinks Mrs. Chase denied at different times all the debts so exhibited to witness; that she alleged that her name had been signed to notes without her knowledge or consent, but to what extent or number he cannot now remember; that he frequently heard Mrs. Chase allege, that many notes had been forged, but as to these additional claims he has no specific recollection; witness would not have paid any of these notes without having the handwriting authenticated, because her signature was easily counterfeited, and she constantly alleged that it was so; had witness never heard any thing he should have supposed the signatures genuine.

The other testimony in the case, in regard to the amount and value of Mr. Chase's property, is sufficiently stated in the opinion of *Justice Eccleston.*

*Exceptions* were then filed by the complainants, to various portions of the testimony on the part of the defendants, which need not be particularly stated as no decision was made upon them. The defendants also *excepted* to the testimony of Pitts, referred to in the opinion of this court, upon the ground

of interest, and then filed various *exceptions* and *objections* to the various claims filed in the cause, the nature and purport of which latter exceptions, are sufficiently stated in the opinion of *Justice Eccleston*.

The court below, (KREBS, J.,) delivered an opinion, and passed a decree vacating and annulling the deed as fraudulent and void, as well against the *subsequent* as the *antecedent* credi-tors, and directing the property to be sold for the payment of their claims. From this decree the defendants appealed.

The cause was argued before LE GRAND, C. J., ECCLE-STON and TUCK, J.

*Robert J. Brent* and *John Nelson*, for the appellants :

By the decision in 6 *Md. Rep.*, 235, the very deed now sought to be vacated, was held to be a valid conveyance of her estate, made by Mrs. Chase, on the 2nd of August 1844, to the appellants, and it must remain as such unless it be now ascertained to have been a fraud upon creditors. The ques-tions, therefore, now to be discussed are: 1st, was this deed a fraud upon creditors ; 2nd, are these complainants creditors who can impeach it ; and 3rd, if avoided as to *antecedent* creditors, is it void also as to *subsequent* creditors ?

1st. A deed is fraudulent upon two grounds, 1st for the *in-tention* to defraud; 2nd, by being so *in effect*. *Prior* creditors can impeach a deed upon both these grounds. *Subsequent* creditors can impeach it only on the first ground. The his-tory and motives of this deed, the parties to it, the provisions made by her will and codicils, (which are a part of the deed,) for the payment of her debts, her reservation of the life-es-tate so far beyond her wants, the dedication of this very life-estate afterwards to her creditors, her deed to pay Morris, her letter of the 30th of December 1847, to Banks, relied on by the other side : all these facts show conclusively that Mrs. Chase's principal intention all along, was to provide for her creditors and pay her debts. Not a particle of evidence is to be found, showing any other than an anxious pervading de-sire to pay her debts, and the sad spectacle is seen of an aged

female possessed of an ample fortune, reducing herself to downright misery and want, that she might pay debts not contracted by herself for her own use, and for which those who claimed them paid for the most part, a trifling consideration, and with knowledge of her feeble situation. It is in vain that this record is explored for evidence of a *fraudulent intention.* A fraudulent intention must be *proved,* it will not be presumed. 3 *Md. Ch. Dec.,* 35, *Grover vs. Grover.* The evidence shows it was a settlement founded on the best motives, and made under the advice of counsel and friends. It was executed to carry into effect an intention which had existed for years; it was made to make irrevocable a will executed in 1836. If there was fraud upon whom was it to operate? Mrs. Chase never knew that Banks was in life at the date of this deed; Banks, however, had actual knowledge of the *existence* of this deed, shortly after it was executed, and if he became a purchaser afterwards, he bought with his eyes open to the fact, that the *title* to this property had passed *out of Mrs. Chase,* and the deed was sufficient to put him *upon inquiry* as to the *trusts* contained in the will and codicils. There was then no *fraud in fact,* either appearing upon the face of the deed, nor any *intention* to defraud as exhibited by the *motives* and *objects* of the parties who executed it. Neither can this deed be impeached upon the other ground, as being fraudulent *in effect.* This inquiry limits the discussion to the rights of *prior creditors* and to a consideration of the evidence relating to the dates and amounts of the claims against Mrs. Chase, on the one hand, and on the other, of the situation and value of her reserved estate and means to pay her just debts. We think the principle governing this case is expounded in the case of *Baxter vs. Sewell,* 3 *Md. Rep.,* 334, where it was said by this court, that "an indebtment at the time of executing a voluntary conveyance, is only *prima facie* and not *conclusive* evidence of fraud, even as to a *prior creditor;*" and in the case of *Dietus vs. Fuss,* 8 *Md. Rep.,* 148, where it is said : "The question in such cases is, as to the grantor's ability to pay his debts, the amount of these and his means;" and also in *Worthington and Anderson vs. Ship-*

*ley*, 5 *Gill*, 449, 458. *Atkinson vs. Phillips*, 1 *Md. Ch. Dec.*, 507. *Sewell vs. Baxter & wife*, 2 *Md. Ch. Dec.*, 447, 455 ; and *Bullett vs. Worthington*, 3 *Md. Ch. Dec.*, 104. When a voluntary deed has been duly recorded, none but *prior creditors* can impeach it. 8 *Wheat.*, 229, *Sexton vs. Wheaton.* 11 *Wheat.*, 199, *Hinde vs. Longworth.* 12 *Johns.*, 558, *Verplank vs. Sterry.* The *recording* of this deed was full *notice* of the conveyance of this property, 6 *Md. Rep.*, 235, and *note* at 272. 4 *Md. Rep.*, 137, *Mason vs. Martin.* 3 *Md. Ch. Dec.*, 57, *Johns vs. Reardon.* Is then this deed fraudulent *in effect*, and this raises the second inquiry.

2nd. Are these complainants creditors who can impeach it? We do not deny that Mrs. Chase appears to have owed some debts at the time of executing the deed, and we admit that the *onus* of proof is on us to show, that she possessed the means of paying them after the deed was executed, and we expect to be able clearly to establish this fact. But we say that the claims asserted by these complainants when examined upon familiar legal principles, will be reduced to an amount far below the means reserved by Mrs. Chase to pay her just debts. In fact these claims have been for the most part trumped up, ante-dated, and to be questioned (some of them) as forgeries. These claims are upon promissory notes purporting to be signed by Mrs. Chase; accommodation notes given to William C. Barney, and passed by him when overdue and payable without recourse, and dated and issued for many thousand dollars on the same day, one large batch appearing to have been issued *just before* the deed to the appellants, and another *just before* the deed to Talbott. The answers of the claimants to the interrogatories filed, show what inadequate considerations were paid by the holders, and the court will not fail to observe how evasive and unsatisfactory are some of these answers. Before we proceed to examine these claims in detail, to ascertain who are prior creditors, and the amount of their claims, we inform the court that we have excepted to some of them, and objected, that they are subject

to be dismissed from the case or reduced in amount on the following grounds :

1st. That they are not properly in the case, or authenticated, or proved, and are ante-dated.

2nd. For being tainted with usury. Notes given to raise money on, create no debt or liability until passed away to a third person, and under the facts proved, many, if not all these notes, were obtained upon usurious terms. 7 *Pet.*, 106, *Nichols vs. Fearson.* 1 *H. & G.*, 477, *Saurwein vs. Brunner. Chitty on Bills*, 82. *Acts of* 1824, *ch.* 200, and 1845, *ch.* 352.

3rd. Because they are barred by the statute of limitations pleaded in the answers, and relied on in the exceptions, and limitations applies to the *time of filing the claims.* 12 *G. & J.*, 36, *Hall vs. Creswell.* 6 *Md. Rep.*, 319, *McDowell vs. Goldsmith.* 2 *Bland*, 37, *Welch vs. Stewart. Md. Ch. Pr.*, 142, 143. And this defence applies in equity if the cause of action was suable at law. 1 *Gill*, 248, *Berry vs. Pierson.* 3 *Gill*, 161, 162, *Dugan vs. Gittings.* 3 *Gill*, 169, 170, *Allender vs. Trinity Church.*

4th. Because they were obtained by fraud, imposition and undue influence, practiced upon a very aged woman, and such contracts if not annulled will not be enforced by a court of chancery. 11 *Wheat.*, 103, *Harding vs. Handy.* 6 *H. & J.*, 442. *Watkins vs. Stockett.* 1 *Wheat.*, 179, *Hepburn vs. Dunlop.* 11 *Pet.*, 229, *Jackson vs. Ashton.* 8 *Gill*, 357, *Hays vs. Hollis.* 4 *Pet.*, 311, *King vs. Hamilton.* And this especially where inadequacy of price is added to imposition. 5 *Pet.*, 264, *Cathcart vs. Robinson.*

5th. Because they claimed under the deed to Talbott, and received their dividends, and are *estopped* from impeaching the deed to the appellants, which is recited in Talbott's deed, which latter was operative solely upon the life estate reserved in the former. 7 *Md. Rep.*, 272, *Lanahan vs. Latrobe.* 4 *Md. Rep.*, 306, *Jones, et al., vs. Horsey.* 11 *G. & J.*, 314, 327, *Moale vs. Buchanan.* 10 *G. & J.*, 111, *Gibson vs. McCormick.* 5 *Gill*, 505, *Hall vs. United States Ins.*

Williams, *et al.*, *vs.* Banks, *et al.*

*Co.* And such *ex post facto* affirmance will cure any original fraud. 12 *Johns.*, 552, *Verplank vs. Sterry.*

Let us now, keeping in view these legal principles, proceed to examine on the one hand the claims presented against Mrs. Chase's estate, and on the other, the amount and value of her estate, reserved by the deed to the appellants to pay them. The total amount of debts *appearing* to be antecedent to the deed is about $7122.50. In the most unfavorable aspect, this is absolutely all Mrs. Chase owed at the date of this deed. Now, of this indebtment, is 1st, the note held by N. Williams for $250, and his account for $100. This amount is subject to our first objection: it is not properly in the case. Mr. Williams has not and does not file or assert it, and he claimed under Talbott's deed and accepted his dividend. 2nd. Mrs. Oldfield's debt to Sarah Polk, for $100, the note to Pitts for $250, and Elion's claim for $350. These are undisputed debts, but are all subject to our third objection on limitations, as they were none. of them filed in this case, until returned, with the commission under which they were proved, on the 17th of February 1851. 3rd. Renwick's note of the 30th of July 1844, for $2000. This note was passed to him after due by Barney and *after Mrs. Chase's death*, in 1849, and was filed in the case before the commissioner on the 17th of February 1851, and as it fell due the 2nd of August 1846, it is liable to our third objection on limitations. His answer admits he got this note on the 16th of June 1849, and that he then paid for it in cash, and accounts only for $1306.12, to Barney. Now it is proved that Mrs. Chase gave Barney these notes to raise money on, that he had no means, and could not even pay his tailor's bill, that Mrs. Chase never used these notes herself. So we say this was not an obligation or note *until passed* by Barney to Renwick, and the facts then show it was also liable to our second objection for usury, and he could only claim under the act of 1845, ch. 352, his real advance of $1306.12. Besides this, we deny that Renwick is properly a party in this case, and say his claim is subject to our first objection. He is clearly a *subsequent* creditor, because he became such in 1849, after he had constructive no-

tice of our deed of trust.   7 *Pet.*, 106, *Nichols vs. Fearson.*
1 *H. & G.*, 477, *Sauerwein vs. Brunner.*   6 *Md. Rep.*, 272,
*note.*   4th.  Complainant's exhibit No. 4, dated 30th of July
1844, for $2000, payable at one year.   This claim is an *in-
terloper;* no one asserts the ownership of it; it is not proved,
and its execution only proved by Pitts to whom we have ex-
cepted as an incompetent witness.   In fact this note without
an owner has been put into the case to swell the amount of
debts *dated* anterior to our deed of trust.   It is subject to our
first objection, as not properly in the case; it was not filed un-
til the 17th of February 1851, and is also subject to our third
objection on limitations.   5th.  Is Bank's claim described in
his bill, and appearing to be dated the 30th of July 1844, for
payment one year after date, of $2000.   We find a mystery
surrounding this note.   The bill describes his claim, the *only
one described*, as exhibit D. B., No. 1, but the note is
marked exhibit No. 5.   The answer of Banks, though eva-
sive, admits he got *it, after its maturity*, from one Earhart.   It
is uncertain which exhibit is referred to in his answer; this
however is the only claim filed as of that date.   But however
this may be, whether we go on his admission or the evidence,
he got this note *after he had notice, both constructive and ac-
tual*, of the deed of trust to Williams.   This note is also sub-
ject to our second objection, and under the testimony of both
Dobbin and Talbott, is especially subject to our fourth objec-
tion for fraud and imposition.   Dobbin states that Banks
knew of the undue influence exercised by Banks over Mrs.
Chase, Talbott confirms this, and the answers of Banks, his
exhibits especially, leave us no room to doubt that he was and
is the principal *speculator* upon the feebleness of the aged
grandmother, and the viciousness of the grandson, with a view
to overthrow, for his own gain, "the just and honest expecta-
tions based upon a voluntary deed or settlement, unaffected
by the slightest taint of fraud at the time of its execution."   6
*Md. Rep.*, 266.   But this claim is also subject to our fifth
objection, as the evidence shows Banks claimed and received
dividends under the deed to Talbott.   Now these items em-

brace absolutely every claim appearing to be dated before our deed of trust.

But if none of our objections are well founded, and the *full amount* of these antecedent debts become established, we shall now proceed to show that Mrs. Chase reserved an estate and means sufficient *to pay them all.* Admitting, for the sake of the argument, that all these claims are just, say $7122.50, what was the value of her reserved estate? The evidence clearly shows that this reserved estate, after deducting her support, was of the *annual value* of $4137.17, and from the date of the deed to her death, in March 1848, was, therefore, worth at least $14,480.09, or more than sufficient to pay all claims asserted of date *prior* to the deed *twice over.* But by our exceptions above stated, we show that her *income* for one year was more than enough to pay every just debt; less than *six months* income would pay them all.

Now can it be pretended for a moment, that under this state of facts our deed was *fraudulent in effect?* A reservation of so valuable an estate, and its subsequent dedication to pay her debts, must clearly save both the deed and the name of Mrs. Chase, from any reproach before a court of equity, and must save from the clutch of a shameful speculation the "just and beneficent trusts of her family settlement." Nor can the allegation of the bill, that "she intended to hinder and delay" her creditors, find any better support than the allegation, that she intended "to defraud" them. The providence of God *has proved* that her life estate was more than doubly equal to the payment of her debts, even as now asserted. That she was advanced in years when she made this deed, *might* make it uncertain if her life estate would pay her debts, though she was then in vigorous health. But when this bill *was filed* and our deed assailed, her life was closed, and that was rendered certain which was before, perhaps, in doubt. It must be here observed, that we are considering the *fraudulent effect* of the deed, not the intention. Have these creditors been delayed? If any of them stopped to gather their fruits from Talbott's deed, did we delay them? If they *held* their claims in Mrs. Chase's life time, *dated as they now appear,*

Williams, *et al.*, *vs.* Banks, *et al.*

why did they not proceed to execution, if necessary, against her life-estate, or if they needed the help of equity, was it not as easy to subject her *life-estate* to pay their claims, as it was then, or is now, the fee simple ? We have seen the life estate was more than sufficient: all the "hindrance and delay" have been of their own choice. Have they preferred to wait until death had shut out the light that this poor old lady's *answer* might turn upon their bill? or, more consistent with the rapacious course that some of them have pursued, continued to gather in the spoils from Barney's repository, that they might be able to sweep the whole estate? Such is at least the scope and object of this proceeding, and we see that the principal *subsequent creditors*, who wait behind the advancing prior ones, bear the same names, the same interests. It should be observed, that all these debts on account of Barney, are provided for in the 7th item of the 1st codicil to her will, and we say the true construction of this provision is, to cover *all such liabilities at the date of our deed of trust*, when the ambulatory nature of the will became fixed, and its provisions incorporated as the trusts of the deed, according to the doctrine in *Mayor & C. C. of Balto. vs. Williams*, 6 *Md. Rep.*, 235.

3rd. But we further insist, that if this deed should be set aside as fraudulent as against *antecedent* creditors, the *subsequent* creditors should not be let in to participate in the fund. When a *voluntary* conveyance is vacated for *constructive fraud only*, and not for *actual fraud*, can *subsequent* creditors come in ? They have no *power* to file a bill to set the deed aside, *because* they had no rights to be *affected* by it at the time of its execution. In the case of *actual fraud* the deed is a *nullity*, but not so with a *voluntary deed;* it is good *inter partes*. There is no decision of the Court of Appeals of this State, which has ever decided this question; it was not decided in *Waters vs. Dashiell*, 1 *Md. Rep.*, 455, nor in *Worthington vs. Bullitt*, 6 *Md. Rep.*, 172. This court is, therefore, left free to decide the question, as it ought to be decided, upon principle. The subsequent creditors alone, without *antecedent* debts, could obtain no relief against such a deed, and *Mr. Justice Story*, in his *Eq. Jur.*, sec. 361, says, there is "some diffi-

culty in perceiving how the subsequent creditors can make
·out any right as against the voluntary grantees, *through the
equity* of the *antecedent* creditors." Again, our *registry laws,*
in accordance with which this deed was *recorded,* give *notice*
which is binding upon all subsequent *creditors* and *purcha-
sers, (6 Md. Rep.,* 272, *note,)* and having therefore at the
time of contracting their debts, *notice* of the existence of this
deed, how can they be said to be "hindered, delayed or de-
frauded" by it? The statute of 13 *Elizabeth, ch.* 5, is aimed
not against *voluntary* deeds as such, but only against those
that are *fraudulent* as against creditors, and how can a deed
be fraudulent as to a creditor, who contracts his debt with
full *knowledge* of its existence and provisions?

*James Malcolm, St. George W. Teackle* and *J. V. L.
McMahon,* for the appellees:

1st. As to the fraudulent character of the impeached deed
of August 1844:—This deed conveys all the property of the
grantor, without any exception whatever, upon the trusts de-
clared by her previous will and codicils, and thereby (accord-
ing to the construction of that deed by this court in 6 *Md.
Rep.,* 235) passed the whole property immediately and irre-
vocably to the trustees, upon the trusts, as if recited in the
deed. By this deed, therefore, it appears that Mrs. Chase
placed all her property beyond the reach of her creditors, ex-
cept the rents and profits of her reserved life-estate, she being
then about or quite ninety years old, and one-half of such
rents as might arise after her decease, from a ground rent of
$43.50, and from the leasing thereafter by the trustees of an
unimproved and unleased piece of ground called "Newing-
ton," containing about seven acres, which latter, by her will,
is made applicable, and only after her decease, to any balance
of money due and owing from her at her death, on account
of her grandson William Chase Barney. This deed is in
law fraudulent and void, as to the then creditors of Mrs.
Chase, not only because it did not leave open to them an am-
ple and unembarrassed sufficiency of property to pay their
edbts in any mode, but also because it threw them for the

payments of their debts, during her life, upon the mere *rents and profits* of her property, and that only to be reached *against* and not under the trusts, and after her death left no property applicable to the payment of any of them, except only the half of the rent of $43.50, and of "Newington," when leased, and that only to pay such of them as fall within the special trusts above stated. And being thus fraudulent and void as to *prior creditors*, it was properly vacated and set aside for the benefit of *all creditors*, *subsequent* as *well as prior*. It was also void as to subsequent as well as prior creditors, because it was made in *contemplation of future indebtedness* by Mrs. Chase, and to protect her property against such future indebtedness, and that too by means of a deed, whose trusts, after her decease, being declared by her will, were necessarily kept secret from such creditors, and her purposes as to them and their debts kept concealed from them until her death. These positions are fully sustained by the authorities. 3 *Md. Rep.*, 11, 37, 40, *Green vs. Trieber.* 1 *Md. Rep.*, 470, *Waters vs. Dashiell.* 8 *Md. Rep.*, 426, 427, *Malcolm vs. Hodges.* 3 *Md. Rep.*, 52, *Sangston vs. Gaither.* 5 *Gill*, 449, *Worthington & Anderson vs. Shipley.* 1 *Md. Ch. Dec.*, 507, *Atkinson vs. Phillips.* 2 *Md. Ch. Dec.*, 455, *Sewell vs. Baxter & wife.* 3 *Md. Ch. Dec.*, 105, *Bullett vs. Worthington.* 2 *Younge & Coll.*, 172, 177, *Ede vs. Knowles.* 1 *Conn.*, 525, *Salmon vs. Bennett.* 9 *Smedes & Mar.*, 394, *Arthur vs. Commercial & Rail Road Bank of Vicksburg.* 13 *How.*, 98, *Parish vs. Murphree.* 4 *Cond. Eng. Ch. Rep.*, 265, *Richardson vs. Smallwood.* 2 *Bland*, 35, *Kipp vs. Hanna.* 10 *Paige*, 210, *Brownell vs. Curtis, et al.* 6 *Barb.*, 91, *Browning vs. Hart.* 1 *Amer. Lead. Cases*, 55 to 73, (3rd Ed.) 1 *Story's Eq.*, secs. 361 and *notes*, 354, 355. 1 *McCord's Ch. Rep.*, 518, *Iley vs. Niswanger.*

2nd. As to the existence of the *prior indebtedness.* The record clearly shows the existence of such indebtedness, amounting in the aggregate to over $7000, and among these debts is the claim of *Elion* upon a note dated the 2nd of July 1844, upon which he obtained judgment against Mrs.

Chase, herself, in 1846. In regard to the defences set up to defeat these as well as the other claims, it will suffice here to say, that the judgment of *Elion* is *unobjectionable on all points:* that *Renwick's* claim on this note for $2000, dated 30th of July 1844, is free from the objections of limitations, *which is not pleaded or objected to it*, and of acceptance of dividends under Talbott's deed; that *Banks'* (exhibit No. 1 or No. 5) is free from limitations, his bill having been filed within three years after its maturity, and he received no dividends on it under Talbott's deed, nor is there any such objection to it, or indeed to any other claim of Banks, set up either by the answers to his bill, or by the only exception to this and his other claims; that *Mills'* is free from limitations, this claim being *specifically excepted* from that objection, *by the only objection or exception to it*, and also from the only other objection made to it, of the acceptance of dividends under Talbott's deed. It has been objected, that the notes dated the 30th of July 1844, though dated *prior* to the deed, are not *antecedent* debts, because they were *accommodation* notes, and were not passed to the present holders and claimants till they were *over-due*. This however cannot be law, for every note is presumed to be made when dated, and made upon consideration, unless the contrary is *proved*, and when endorsed, it is presumed to be endorsed about the time of its date, (6 *Md. Rep.*, 338, *McDowell vs. Goldsmith*,) and as soon as an *accommodation* note is passed it becomes a debt *ab origine*, and limitations begin to run *from its date*. 1 *Amer. Lead Cases*, 71, 72, 73, (*3rd Ed.*) It may here also be remarked, that there are many of the claims against which no objections have been set up, either by way of answer, exception or objection, and of these a part consist of *judgments* against Mrs. Chase herself, in her lifetime.

3rd. As to the defence of *limitations*. The *judgments* above stated including that of *Elion*, are, of course, unaffected by this defence. As to *Banks'* claims, none of them were due more than three years before the filing of his bill, and are therefore unaffected by the defence of limitations; and even if they were, the acknowledgment of Mrs. Chase, and her

express approbation of his taking certain of these claims, and that he should take them for the reasons there assigned, as proved by Mrs. Oldfield, and her written note of the 30th of December 1847, witnessed by the defendants, Mrs. Oldfield and Mrs. Barney, are of themselves amply sufficient, to take his claims out of the statute. 9 *Md. Rep.*, 52, *Peterson vs. Ellicott.* The only other claims against which this defence is set up, are those of N. Williams, S. Polk and C. H. Pitts. In regard to these, and indeed, all the claims in the case, we insist that the defence does not apply, because the trusts of the impeached deed excluding the grantor's creditors after her decease from payment out of any part of her property, except the rents of a small part above mentioned, were not notified to her creditors, but, as declared only by her will and codicils, were necessarily kept secret from them until her death, and the probate of her will in April 1848, at which time the *fraud* was discovered, and from *that time only* the statute began to run against the claims of the defrauded creditors; also that this defence does not apply to them, because, with one or two exceptions, these claims were not barred at the period of her death, and the trusts of her will for the payment of them out of part of the rents of "Newington," speaking as of the date of her death in March 1848, are sufficient to preclude the bar as to such debts then existing and not barred.

4th. As to the defences of usury, ante-dating, want of consideration and fraud:—The answers allege these defences against the claims of the original complainants, and the exceptions urge the same objections against the claim of Renwick. Now as to Renwick's claim, there is no proof of ante-dating or of fraud, and the only objection which could be taken on the score of original want of consideration, and of being taken by him after it was due, is fully disposed of by this court in its decision on this very note, in his suit on it against the executors of Mrs. Chase, who are also the trustees under this deed, in 2 *Md. Rep.*, 356. But the mere fact of want of consideration between the original parties to a note will not *shift* to the *endorsee* the *onus* of proving that he gave value for it. 6 *Md. Rep.*, 515, *Ellicott vs. Martin, Love & Co.* 85 *Eng.*

*238, C. L. Rep., Fitch vs. Jones.* Again, there was considera‑ tion for this note as between the original parties to it. It is dated the 30th of July 1844, and the proof shows that *on the same day* Barney gave his note to Mrs. Chase for $4000. There were then, on the same day, *cross-notes* given by these par‑ ties,—a mutual exchange of paper, which constitutes a *suffi‑ cient consideration* for the notes. *Byles on Bills*, 191. The defence of *usury*, therefore, fails as to this claim, but if there be usury the claim is only void as to the excess, under the act of 1845, ch. 352. As to the claims of Banks, we insist that there is no tittle of proof in the record to sustain any of the de‑ fences urged against them. So far from there being any evi‑ dence to sustain the allegation of any fraud or fraudulent con‑ trivance on his part to obtain these claims, the evidence by Mrs. Chase's own written statement for him, of the 30th of December 1847, witnessed by the defendants, her daughter and granddaughter, Mrs. Barney and Mrs. Oldfield, and her previous approbation of his taking them, and her expressed de‑ sire, as proved by Mrs. Oldfield, coupled with her acknowl‑ edgment of him as her largest creditor, and of his kindness and generosity towards her, and her anxious desires, there ex‑ pressed, that a part of her property should be sold to pay his claims, and that he should have as little trouble as possible in getting them, not only repel any such imputations, but on the contrary rather evince fraud *on him* in the effort to put the claims upon him if there was a purpose to impeach them on any such ground, or to exclude them from payment.

5th. As to the objection of acceptance of dividends under Talbott's deed:—The only claims which, by *the record*, are objected to on this ground are those of Williams, Polk, Pitts, Elion and Mills, and none of the claims, *prior* in date to the deed, are open to this objection, if it had been made, except those of Williams, Polk and Pitts, and by the terms of Tal‑ bott's deed it excluded all debts contracted after its date, the 30th of January 1845. As to Banks, though there is no ob‑ jection for this cause to any of his claims, there is evidence of his receiving dividends on some claims, but on what does not sufficiently appear, but it is expressly admitted that his claim

on the note filed with his bill of the 30th of July 1844, did not receive any dividend.

By reference to this deed, it will be seen, that all the rights granted to creditors by it take effect entirely under it, and that instead of being made to carry into effect any rights secured to creditors by the previous and impeached deed of 1844, or even being in consonance with it, it merely appropriates, unconditionally for their benefit, the profits of her life-estate, which was secured to her under the deed of 1844, and then assuming the whole property to be under her control, re-grants it, after her decease, on the secret trusts of her will and codicils. The property, subject only to her life enjoyment of the profits, having been irrevocably vested in the trustees, under the deed of 1844, her conveyance in 1845 was purely inoperative and void at her decease, because of the expiration of her title at that period, as shown by the deed itself. And as to the claims against which this objection has been urged and proved, (if any,) we insist, that the acceptance of dividends, under Talbott's deed, even if conceded, did not preclude the claimants from impeaching the prior deed of 1844, as fraudulent, or from claiming payment if that deed is set aside as fraudulent, at the instance of other creditors; that the acceptance of benefits derived to them entirely from the deed of 1845, was no assent to the prior deed, but rather the contrary, and was, at the most, but an assent to the reception of the rents and profits from her, or her trustees, unconditionally appropriated, without any express or implied agreement on their part, beyond the extent of her title, or for any surrender or compromise of their claims, or of their right to enforce them, at her death, against the prior title, and, at most, but a payment *pro tanto* on account of such claims; that such acceptance, even if it could possibly be deemed an assent to the prior deed, if it is claimed to be an act of *election* on the part of the creditor to abandon his rights as against the first deed, for the benefits given to him by the second, (if conceded to be a case for election, as it is not,) could not bind him as such, if made in ignorance of his rights, nor unless made with a full knowledge of all the facts material to such an election, and especially of

the extent to which that deed affected his rights and required his surrender of them; and if it is alleged to be an assent to, or an acquiescence in, a fraudulent deprivation of his rights, could not in law operate as a binding confirmation by the creditor of such act of fraud against himself, unless made with the full knowledge of the fraud practiced upon him, and the extent of it; and that, therefore, such an acceptance could not, in this case, operate as such an election or confirmation, because the trusts of both deeds, after her decease, being declared only by her will and codicils, were thus necessarily concealed from, and were in fact unknown to, the creditors, until her death, and did not even furnish any presumption of intent by them (until they were made known at her death) to preclude the creditors from payment at her death, but the contrary. And as to the claims, (if any,) against which this objection may be urged, although not alleged against them by answer or exception, that they are not affected by it, not only upon the grounds above stated, but also because they were not thus objected to. For these positions see 2 *Story's Eq.*, secs. 1075, 1089, 1092, 1097, 1098. 2 *Sch. & Lef.*, 486, *Mauray vs. Palmer.* 2 *Ball & Beatty*, 317, *Dunbar vs. Fredeunick.* 5 *Cond. Eng. Ch. Rep.*, 468, *Cockerell vs. Cholmeley.* 3 *Cond. Eng. Ch. Rep.*, 298, *Honner vs. Morton.* 3 *Cond. Eng. Ch. Rep.*, 411, *Coleman vs. Jones.* 2 *Mylne & Keene*, 225, *Bennett vs. Colley.* 1 *Hoffman's Ch. Rep.*, 280, *Fish vs. Miller.* 9 *Pet.*, 608, *Owings vs. Hull.* 3 *Yerger*, 369, *Cherry vs. Newsom.* 3 *Call.*, 476, *Broddus vs. McCall.* 14 *Pick.*, 221, *Rice vs. Catlin.* 1 *Jarman on Wills*, 389. 2 *Sumner*, 563, *Flagg vs. Mann.*

The opinion of the court was delivered as follows:

*By Justice* ECCLESTON :—

This bill was filed for the purpose of vacating the voluntary deed executed by Hannah K. Chase, on the 2nd of August 1844, upon the ground of its being void, because fraudulent as to creditors, under the *Statute of 13th of Elizabeth, ch.* 5. The suit was instituted for the benefit of the complainants and all other creditors of the grantor, who should come in and con-

tribute to the expenses of the proceeding. Both antecedent and subsequent creditors are claimants.

The deed was executed for the purpose of conveying to Nathaniel Williams and Joseph B. Williams all the estate and property, real and personal, of the grantor, in trust "to suffer and permit the said Hannah K. Chase and her assigns, for and during the period of her natural life, to have, hold, use, occupy, possess and enjoy, all and singular, the estate, chattels, effects and property thereby conveyed and assigned, and the rents, issues, income and profits thereof, during that period, to receive and take, and the same to apply to such uses and purposes as she might think proper; and from and immediately after the decease of the said Hannah Kitty Chase, then in trust, and under and subject to the like powers, limitations, restrictions and conditions as are mentioned, expressed and declared, of and concerning the estate and property generally mentioned in and devised by the last will and testament of the said Hannah Kitty Chase, to the trustees therein named, and in and by the three several codicils by her made to said will." The date of the will, and the dates of the three codicils referred to, are stated in the deed.

With the exception of a lot of ground called "Newington," and a ground-rent of $43.50 per annum, according to the provisions of the deed, (considering the will and three codicils as constituting parts of the same,) the trustees were to hold the whole estate of Mrs. Chase, after her decease, for the use of her daughter and grandchildren.

By the 10th clause of the will, "Newington" and the ground-rent of $43.50 were to be for the use of William C. and Samuel C. Barney equally. By the codicil dated the 9th of June 1841, this provision of the will is revoked, and one-half of "Newington" and of the said ground-rent are to be held in trust for the use of Samuel C. Barney; the other half being disposed of in the following language: "And whereas, I am now liable for the payment of large sums of money for and on account of my grandson, William Chase Barney, the payment of which I am gradually effecting during my life, but which may not be wholly accomplished before my death, I

direct my said trustees to hold the other undivided one-half part of the said property, in trust for the following uses, intents and purposes, that is to say, in trust to apply the rents, issues and profits of the said half part, in the first place; to the payment of any balance of money due and owing from me at the time of my death, for or on account of my said grandson, William C. Barney." And after such payment the said half is directed to be held in trust for his use for life, and then for his children.

Previous to any examination of the proof in regard to the condition of Mrs. Chase's affairs, at the date of this deed, we deem it proper to notice some decisions with reference to the construction of the *Statute of* 13*th Eliz.*, *ch.* 5.

The cases on this subject are numerous, and distinguished jurists have entertained conflicting opinions in regard to the interpretation of the statute in some respects. To undertake an examination of the decisions, with a view of reconciling them, would require much labor without any hope of success.

In *Reade vs. Livingston,* 3 *Johns. Ch. Rep.,* 481, Chancellor Kent held, that indebtedness at the time of executing a voluntary conveyance, conclusively fastens upon the instrument a fraudulent character, as an inference of law, with reference to the claim of an existing creditor. But this doctrine has been repudiated in *Worthington & Anderson vs. Shipley,* 5 *Gill,* 449. Instead of sustaining Chancellor Kent our Court of Appeals refer to the opinion of the Supreme Court of Connecticut in *Salmon vs. Bennett,* 1 *Conn. Rep.,* 525, as enunciating what is to be considered the true interpretation of the *Statute of Elizabeth.* And there we find it said: "Mere indebtedness at the time will not, in all cases, render a voluntary conveyance void as to creditors, where it is for a child in consideration of love and affection." "Nor will all such conveyances be valid, for then it would be in the power of parents to provide for their children at the expense of their creditors. Nor is it necessary that an actual or express intent to defraud creditors should be proved, for this would be impracticable in many instances where the conveyance ought not to be established."

In the same opinion it is held, "that a voluntary convey-ance may be valid against existing creditors if there is no ac-tual fraud intended, and the grantor is in prosperous circum-stances, unembarrassed, and not considerably indebted, and the gift is a reasonable provision for the child, according to his state and condition in life, comprehending but a small por-tion of his estate, and leaving ample funds unencumbered for the payment of the grantor's debts. But though there be no fraudulent intent, yet, if the grantor were considerably in-debted and embarrassed at the time, and on the eve of bank-ruptcy; or if the value of the gift be unreasonable, consider-ing the condition in life of the grantor, disproportioned to his property, and leaving a scanty provision for the payment of his debts, then such conveyance will be void as to creditors."

The conclusion of the court's opinion in *Worthington &* *Anderson*, *vs.* *Shipley*, shows, that although an indebtment at the time of a voluntary deed, is only *prima facie* and not conclusive evidence of a fraudulent purpose, even as regards a prior creditor, yet the *onus* is thereby cast upon the grantee of showing "that the grantor, or donor, at the time of the gift was in prosperous circumstances, possessed of ample means to discharge all his pecuniary obligations, and that the settlement upon the child was a reasonable provision, according to his or her station and condition in life." See, also, 11 *Wheat.*, 211, *Hinde's Lessee vs. Longworth;* 13 *How. S. C. Rep.*, 99, *Parish, et al., vs. Murphree, et al.*

With the cases of *Salmon vs. Bennett*, and *Worthington &* *Anderson vs. Shipley*, before him, in *Bullett vs. Worthing-ton*, 3 *Md. Ch. Dec.*, 105, Chancellor Johnson, we think, very correctly said: "The party who sets up a voluntary conveyance in opposition to the claims of pre-existing credit-ors, is required to show, by evidence which leaves no reasona-ble doubt upon the subject, that the means of the grantor, in-dependent of the property conveyed, are abundantly ample to pay them all. If there be a reasonable doubt of the ade-quacy of his means, or if his property be so encumbered, that delays, difficulties and expense, must be encountered before it can be made available to his creditors, then, as I conceive, the

voluntary conveyance must fall, because then it has the effect to delay and hinder his creditors."

We will now endeavor to ascertain whether claims have been exhibited and proved, which, in point of character and amount, are sufficient to justify a decree for vacating the deed in controversy.

The claims relied upon by the complainants as antecedent debts, are the following:

| | |
|---|---:|
| The note given to N. Williams, on the 9th of December, 1841, for | $250 00, |
| N. Williams' account for fees, | 100 00 |
| Mrs. Oldfield's debt to Sarah Polk, 6th of May 1843, | 100 00 |
| Note given to C. H. Pitts, 18th of June 1844, | 250 00 |
| Note to H. C. Elion, 2nd of July 1844, payable six months after date, | 350 00 |
| Note to W. C. Barney, July 30th, 1844, payable two years after date, and endorsed to W. P. Mills, | 300 00 |
| A Note dated the 30th of July 1844, payable two years after date, given to W. C. Barney, and endorsed by him to R. Renwick, 16th of June 1849, marked Exhibit No. 3, | 2000 00 |
| A note dated the 30th of July 1844, payable to W. C. Barney one year after date, now claimed by D. B. Banks, marked Exhibit No. 4, | 2000 00 |
| A note dated the 30th of July 1844, payable to W. C. Barney one year after date, which is described in the Bill of Complaint as held and owned by D. B. Banks, marked Exhibit D. B. B., No. 1, but appearing under the commission to be No. 5, | 2000 00 |
| Total amount exclusive of interest, | $7350 00 |

In the examination of the proof by which these claims are sought to be established, the evidence of Mr. Pitts must be held inadmissible. He has been objected to on the ground of interest, because the note given to him by Mrs. Chase was endorsed by him to W. H. Harrison & Co., and has been protested for non-payment. We think he is not competent to prove the existence of a claim, to be used for the purpose of authorising a decree to set aside the deed; as his evidence would be to assist in creating a fund, or in rendering property liable for the payment of the note, which he, as endorser, would otherwise have to pay; and without the least prospect of his ever being repaid, unless this deed is declared void;

for if valid Mrs. Chase's estate is largely insolvent. See *Owens vs. Collinson*, 3 *G. & J.*, 32, 33, 34; *Clagett vs. Hall*, 9 *G. & J.*, 96, 97.

The testimony of this witness being the only proof to establish either the execution or the indorsement of the note of the 30th of July 1844, marked Exhibit No. 4, it must be regarded as having no proof to sustain it.

The signature of Mrs. Chase to each of the notes mentioned in the foregoing list of claims has been proved by the witnesses, Alexus B. Wolfe and Joshua Cockey. Her signature to the claim of Sarah Polk has also been established by the same witnesses.

Upon the note to Elion he obtained judgment against Mrs. Chase, on the 28th of March 1846.

The complainants filed the following interrogatories, to be answered by W. P. Mills:

"*First.*—When did you receive the promissory note referred to in your petition, filed with the papers in the aforesaid case of *Banks and Stewart against Williams and others?* From whom did you receive it? and was it after it was overdue? File the original note, or a copy of it, with your answer.

"*Second.*—What consideration was paid for it, in money or otherwise, by the payee to the pretended maker of said note? Did the payee ever state to you the consideration he had paid for it, or that he had paid no consideration therefor?

"*Third.*—What consideration did you pay for said note; in money or otherwise? To whom did you pay any consideration?

"*Fourth.*—Has any other person than yourself, and if any, what person, any interest in said note?"

Interrogatories similar to these were propounded to R. Renwick, in reference to his claim, exhibit No. 3.

D. B. Banks was also required to answer like interrogatories in regard to his claim, spoken of in the bill as exhibit D. B. B., No. 1, but which is exhibit No. 5, according to its description under the commission. The interrogatories to Banks are omitted in the record, but it is conceded they were like

those propounded to Mills, and the answers to them show the propriety of the concession.

Under the act of 1785, ch. 72, sec. 21, the answers to such interrogatories are "evidence in the cause, in the same manner, and to the same effect, that the defendant's answer to the plaintiff's bill is evidence."

Mills answered as follows:

"1. I received the note in question from William Chase Barney before its maturity; the precise day I cannot state; the original is already filed.

"2. I do not know what consideration was paid for said note by the payee to the maker; the payee did not state to respondent any thing about the consideration he paid for said note; never stated that either he or the maker had had no consideration therefor.

"3. I paid the full value of the note in question to William Chase Barney, partly in money, partly in clothes.

"4. No one but myself is interested in said note."

R. Renwick's answer to the first interrogatory is, "that the note filed in this cause came into his possession on the 16th day of June 1849, after it became due, from William Chase Barney, the payee." To the second interrogatory he says, he "does not know what consideration was paid for said note by the payee, and he never informed him, and never told him that he had *paid no consideration*." To the third interrogatory he answers, "that he paid the sum of fifty-five dollars and fifty cents, in cash and furniture, on the 16th day of June 1849, and receipted a bill of furniture, due to this respondent from payee, amounting to one thousand sixty-seven dollars and twenty-nine cents, with interest thereon, making a sum total of $1306.12, paid for said note by this respondent to said payee, William Chase Barney." The fourth interrogatory is answered by saying, "that no other person than this respondent has any interest in said note."

D. B. Banks answers the interrogatories in the following manner:

To the first he says: "That he does not recollect the time when he received the promissory note mentioned in the said

interrogatory, as he received at different times several notes of similar date and amount with the one mentioned in said interrogatory, and drawn and endorsed by the same parties; that he thinks he received the note mentioned in said interrogatory from George W. Earhart, from whom this respondent purchased it. This respondent thinks he received the said note after its maturity."

To the second interrogatory he answers: "That he cannot recollect the sum paid by him for the note mentioned in said interrogatory, because there were several notes of same date and amount received by him at different times; nor does he know what consideration was paid to the maker of said note by William C. Barney or any other person, but that the amount of the different notes drawn by Hannah K. Chase, and held by this respondent, were acknowledged by her to be due to this respondent by her."

To the third interrogatory he says: "That he is under no engagement to pay Wm. Chase Barney the consideration, or further consideration, in the event of a recovery of said note in whole or in part; the said note was bought and paid for as the property of this respondent, and is absolutely his without any contingent consideration connected in any possible way with it whatever."

These answers of Mills and Renwick show the sale and transfer, from Wm. C. Barney, of the notes claimed by them respectively. So likewise the answers of Banks are evidence of the sale and transfer, from Barney, of the note marked exhibit No. 5, but cannot be regarded, under the act of 1785, as proof in support of the note, marked exhibit No. 4. The interrogatories relate *alone* to No. 5, and what is said in the answers respecting any other note cannot be evidence, because not responsive to the interrogatories.

In their statement, or brief, the defendants say: "Before we proceed to examine these claims in detail, to ascertain who are prior creditors, and the amount of their claims, we inform the court that we have excepted to some of them, and objected that they are subject to be dismissed from the case or reduced in amount on the following grounds:

"1st. That they are not properly in the case, or authenticated, or proved, and are ante-dated.

"2nd. For being tainted with usury. Notes given to raise money on, create no debt or liability until passed away to a third person, and under the facts proved, many, if not all these notes were obtained upon usurious terms.

"3rd. Because they are barred by statute of limitations, pleaded in answers, and relied on in exceptions, and limitations applies to the *time of filing claims*.

"4th. Because they were obtained by fraud, imposition and undue influence practiced upon a very aged woman, and such contracts, if not annulled, will not be enforced by a court of chancery.

"5th. Because they claimed under the deed to Talbott, and received their dividends, and are estopped from impeaching the deed to appellants, which is recited in Talbott's deed—which was operative solely upon the life-estate reserved in the deed to Williams."

Under the first objection it has been contended that some of the earliest claims are not properly in the case; because the claimants did not file them, and are not insisting upon their being paid. But surely the complainants have a right to show the existence of those claims at the date of the deed, when they are seeking to invalidate it upon the ground of the grantor's indebteness at the time of its execution. And we suppose it cannot be seriously insisted, that the claims of those who came in as parties after the bill was filed are not properly in the case, merely because they did so come in.

As regards the want of authentication or proof, the objection is a good one in reference to the claim, exhibit, No. 4. But that we entertain a different opinion as regards the other claims mentioned in the foregoing list will appear from what has already been said.

With reference to ante-dating, we see no proof sufficient to establish it in this case, in opposition to the legal *prima facie* presumption that each note was executed by the maker at the date upon its face.

The *second* ground of objection is *usury*. Without deciding

whether this defence is properly presented by the answers and exceptions, in regard to *all* the antecedent claims, we will treat it as if it were so.

Usury has not been relied upon against the claims of N. Williams, S. Polk, C. H. Pitts or H. C. Elion.   The last being a judgment against Mrs. Chase, on a note dated the 2nd of July 1844.   The defendants, in their statement, say: "These are undisputed debts, but are all subject to our third objection on limitations as they were none of them filed in this case until returned with Mr. Pinkney's commission, under which they were proved on the 17th of February 1851."

Mills' claim cannot be defeated upon the ground of usury. His answers to the interrogatories, in the absence of contradictory proof, must exclude such a defense.

R. Renwick's claim, (exhibit No. 3,) came into the cause after the answers to the bill were filed.   The 5th exception of the defendants, as set forth in the record, objects to this claim in the following language:

"And they further except to the note filed among the proceedings and proved by the affidavit of Robert Renwick, because the same was executed long subsequently to the deed of the 2nd of August 1844, and ante-dated so as to appear antecedent to said deed, and because, even if the same were not ante-dated, the said note remained in the hands of W. C. Barney, who held the same for his own accommodation until long after the date of said deed, and after the death of said H. K. Chase, when the same was paid to said Renwick, at the time and for the consideration stated by said Renwick ; and the said note then, and not prior to the execution of said deed, became available as against the estate of said H. K. Chase, and because the said note was concocted and originated in usury to which said Renwick was a party, and nothing is due thereon except the amount so stated by him to have been paid thereon."   By this exception the defence of usury is presented, in regard to the claim.

As the debt existed prior to the adoption of our new constitution the provisions of that instrument, on the subject of usury, can have no effect upon it.   And under the act of 1845, ch.

352, a contract tainted with usury was not void *in toto*, but only void to the extent of the usury, and valid for the amount actually paid or lent.

The proof has fully convinced us, that no consideration for the note in question was given by the payee to the maker;— that it was purely for the accommodation of the former; and that Renwick took it from him nearly three years after it fell due, paying only $1306.12 for the same, it being a note for $2000.

The complainants contend, that conceding the note was purchased, as above stated, still it was not usurious, because there was a valid consideration passing between the maker and payee. In support of which they rely upon the fact, that at Mrs. Chase's death, there was, amongst her papers, a note to her from W. C. Barney, for $4000, dated the 30th of July 1844, payable one year after date. The existence of such note, it is said, shows a mutual exchange of notes, constituting a valid consideration for each; and consequently the purchase by Renwick, although at much less than the amount of the note he received, did not render the transaction usurious. Whether, under the circumstances of this case, such would be the effect of a mutual exchange of paper, we need not stop to inquire, because we do not think there was any such exchange as would make each note an available consideration for the other. That this sort of exchange, which the authorities sometimes call "cross-notes," will amount to a sufficient consideration has been frequently held. But to do so it must appear that it was the intention of the parties to make a mutual exchange of paper. And whether such was their design will depend upon the "particular circumstances of each case." *Chitty on Bills*, 565, (*Ed. of* 1821.) In the case before us Barney was known to Mrs. Chase to be an extravagant spendthrift of the means she was furnishing him with; in cash, by sales of her stocks and by loans or gifts of her notes, totally insolvent, and indeed without funds to procure food and clothing for himself, without her assistance. And we have yet to see the proof that he ever paid her back one of the many notes he received from her. In view of such facts we cannot, for a moment, suppose that

Mrs. Chase either gave her note in consideration of Barney's, or that she intended the transaction between them should be what the law will regard as a mutual exchange of notes.

In *Munn vs. The Commission Company*, 15 *Johns. Rep.*, 55, Mr. Justice Spencer says, in delivering the opinion of the court: "If a bill or note be made for the purpose of raising money upon it, and it is discounted at a higher premium than the legal rate of interest, and where none of the parties whose names are on it, can, as between themselves, maintain a suit on the bill when it becomes mature, provided it had not been discounted, then such discounting of the bill would be usurious." See also *Sauerwein vs. Brunner*, 1 *Har. & Gill*, 477, and *Williams vs. Reynolds & Smith*, 10 *Md. Rep.*, 57, in regard to the subject of usury.

When the note now in question came to maturity it had not been disposed of by Barney, the payee, and a suit upon it could not have been maintained by him against the maker, Mrs. Chase, as it was merely for his accommodation. Subsequently it was purchased from him by Renwick, at the large discount mentioned in his answers. Such a transaction is usurious; and, therefore, on this claim, he is only entitled to the sum of $1306.12, with interest thereon, under the act of 1845.

The complainants' counsel have contended that the decision in *Renwick vs. N. & J. Williams, Ex'rs of H. K. Chase*, 2 *Md. Rep.*, 355, should exclude any defense upon usury against this claim in the present suit. But although, in that case, usury was pleaded, there was no proof to sustain the plea, and no question on that subject came before the court. Their attention appears to have been confined chiefly to the question, whether proving a note to be an accommodation note, and its not being endorsed until over-due, will constitute a sufficient defence to the suit upon the note by the endorsee?

The claim of Banks, filed with his bill, has also been resisted as usurious. The affirmative of this charge by the defendants, rests upon them, under the act of 1845. And they have not sustained it by evidence which can enable the court to decide, that less than the nominal amount of the note was paid for it, and how much less, so that under the 3rd section

of the act, the court may ascertain the amount really due and decree accordingly.

The defendants' *third* objection is, that the claims are barred by limitations.

We need not decide whether the claims of Williams, Polk and Pitts, should be excluded under this defense, because without them there are debts enough to invalidate the deed, and because they were not decided upon below, but were expressly "reserved for further consideration." For these reasons we may also refrain from expressing an opinion as to the effect of the *fourth* and *fifth* objections so far as those claims are concerned.

In the case of *McDowell, et al., vs. Goldsmith,* 6 *Md. Rep.,* 337, this court say: "We can express no opinion as to the last of these claims. The chancellor has neither allowed nor rejected it, but on ·the contrary, has reserved it for further directions."

Limitations cannot bar Elion's claim, as he obtained a judgment upon it against Mrs. Chase, on the 28th of March 1846.

The note held by Mills is dated the 30th of July 1844, payable two years after date. He filed the same on the 7th of July 1849, with his petition, asking to be admitted as a co-complainant; at which time the note had not been due three years. And in their second exception, whilst the defendants are insisting upon the statute of limitations as barring other claims, they except the claim of Mills from its operation, in express terms.

Renwick was not an original complainant, but came in as a party by filing his petition and claim on the 20th of March 1850, which was subsequent to the filing of the answers to the bill. These answers, relying upon limitations, can have no effect upon this claim subsequently coming in. Speaking in regard to persons who were made parties complainants after the filing of the original bill in the case of *McDowell vs. Goldsmith,* 2 *Md. Ch. Decisions,* 390, it is true the chancellor says: "Notwithstanding, however, the claims of these parties have been proved, the plea of limitations, relied upon in the answer, must bar the remedy upon them, unless the fraudulent charac-

Williams, *et al.*, *vs.* Banks, *et al.*

ter of the transaction saves them from the operation of the statute." But the statement of the case shows, that the parties, who came in after the filing of the original bill, and the answer to the same, filed an amended bill. Then followed an agreement that the amended bill should be treated as an amendment "filed by the whole of the parties, originally complainants, and subsequently made so, or applying to be made so, and that the answer of the defendant already filed, should be taken as an answer to said amended bill." Under this agreement the chancellor might well consider the plea of limitations, contained in the answer, as applicable to the claims of those who became parties after the original bill had been filed.

As against Renwick's claim, the statute of limitations has not been relied upon in either of the *exceptions* filed by the defendants, as contained in the *record*. We say as contained in the *record,* for the purpose of distinguishing these *exceptions* from *objections* spoken of as contained in the *statement or brief* of the defendants.

As this claim cannot be affected by the plea of limitations in the answers of the defendants, and as it has not been resisted by such a plea in the exceptions, it is not subject to such a defense.

When Banks' claim, "D. B. B., No. 1" or "No. 5," was filed with the bill, which was on the 29th of July 1848, it had not been barred by limitations, three years not having expired since it fell due.

The fourth objection, stated in the brief, alleges "fraud, imposition and undue influence practiced upon a very aged woman." During the argument, we understood this objection as designed to apply exclusively to the notes given to Barney and endorsed by him. The proof, in our opinion, fails to establish a participation, on the part of the endorsees, or any of them, either separately, or in connection with Barney, in the use of means for the purpose of defrauding, imposing upon, or exerting an undue influence over Mrs. Chase. The evidence shows they purchased the notes from the payee, but how, or in what manner they were instrumental in enabling

him to obtain them from the maker, or that prior to, or at the time of executing the notes, the endorsees had any communication or intercourse with her, verbally or in writing, either directly or indirectly, there is not the slightest proof. And indeed it would seem to be strangely inconsistent with the usual course of human transactions, to suppose that the allegation contained in this objection is true, with reference to participation on the part of Renwick as to his note, or of Banks as to his, No. 5, when it is certain that the former did not obtain his until several years after it fell due, and after the death of the maker; and that Banks became possessed of his when over-due.

That Barney had great influence over his grandmother there can be no doubt. Her extravagant liberality to him is conclusive evidence of this. And it would seem to be equally certain, that his influence was the consequence of her unbounded affection for him. Whether it be true, as alleged, that for the purpose of procuring any of the notes mentioned in the preceding list of claims, Barney resorted to other means than his influence, arising from her affection for him, the evidence furnishes no satisfactory proof.

Mrs. Chase, it must be recollected, although ninety years of age, still had a sound mind, and was very capable of transacting business. It would be a dangerous principle in a commercial community, to hold, in the absence of proof of fraud and imposition, that if a person in her condition sees fit to execute notes for a considerable amount, for the accommodation of her grandson, which are negotiated, even when over-due, such notes may be invalidated, because it is proved the payee had great influence over the maker in consequence of her strong affection for him.

The proof does not convince us that the fourth objection ought to be sustained.

The fifth objection insists upon an estoppel against the claimants, because they claimed under the deed to Talbott, and received their dividends. The 2nd exception of the defendants, in the record, is that on which this objection is based, and is as follows:

"To the claims filed in this cause, as follows, viz: The note and account of Nathaniel Williams, the claim of Sarah Polk, the claim of Charles H. Pitts, the claim of H. Cohen Elion, respectively marked: 'Complainant's Exhibit, No. 1,' 'Sarah Polk, Complainant's Exhibit, No. 2,' 'Charles H. Pitts, Complainant's Exhibit, No. 3,' 'H. Cohen Elion, Complainant's Exhibit B, No. 3;' and also to the note of $300 held by Mills; and in making this exception, the defendants insist, that each and all of said claims, except that of said Mills, on which judgment was recovered, are barred by the statute of limitations, more than three years having elapsed from the maturity thereof, respectively, before the filing of them in this cause; and they further except to the same, because dividends were paid on all said claims under the trust to W. A. Talbott, and the holders thereof are thereby estopped from impeaching the deed of the 2nd of August 1844."

W. A. Talbott filed a statement showing what persons filed claims and received dividends under the deed of trust from Mrs. Chase to him, dated the 28th of January 1845.

The parties agreed to receive as evidence this statement, to the same extent as if the matters therein certified had been proved under the commission. They, at the same time, "admitted that the notes dated the 30th of July 1844, filed in this case before the same was set down for hearing, were not filed for dividends under Talbott's deed of trust, and received no dividends under said deed."

Under this agreement it will be seen, that the claims of Mills, Renwick and Banks, upon their respective notes, dated the 30th of July 1844, were neither presented for dividends, nor received any, under the deed to Mr. Talbott. This 5th objection, therefore, cannot operate upon them. Nor can Elion's claim be affected by it, as the statement of Mr. Talbott does not show any dividend was paid or demanded upon that debt.

The defendants claim the right to use the note for $4000, from Barney to his grandmother, as a set-off against the notes given by the latter to the former, inasmuch as those were accommodation notes, and endorsed when over-due.

In some of the States of the Union, the doctrine thus insist-

ed upon has been maintained, but in others it has not.   In *Chandler vs. Drew*, 6 *New Hamp.*, 469, the question was presented, and after full consideration the court decided against the right of setting-off a claim between the payee and maker, in a suit by the endorsee against the maker, upon an accommodation note endorsed when over-due.   A similar decision was made in *Burroughs vs. Moss*, 10 *Barn. & Cres.*, 558. And those two cases would seem to be sustained by the doctrine announced in *Renwick vs. Williams*, 2 *Md. Rep.*, 363 & 364.

It has been said, that as the notes dated the 30th of July 1844, were all accommodation notes, and were negotiated after the execution of the deed of August 1844, they did not create any debts or liabilities until negotiated, and consequently they were not antecedent, but subsequent claims.   This position is based upon the principle which has been established in reference to the nature of an accommodation note before it is discounted, when considered with regard to a charge of usury; alleged to have arisen at the transfer of the note by the payee to the first endorsee.   Whilst it remains in the hands of the payee the authorities speak of it as not being available, because he cannot maintain a suit upon it; and when passed to the endorsee he is said to be the first holder.

Indeed, in *Munn vs. The Commission Company*, the court go so far in speaking of the character of such a note before it is discounted, as to say, it is nothing more than blank paper. But we do not concur in the correctness of such language to its full extent.   That there is no absolute legal liability whatever upon the maker, which can be enforced against him by any person, until the note is negotiated, there can be no doubt. But it would seem to be equally clear of doubt, that executing the note and delivering it to the payee, with authority to get it discounted, must create a contingent liability on the maker, which will become absolute so soon as it passes into the hands of the party to whom it is regularly endorsed for value.   Supposing, however, there is not even such contingent liability prior to the first endorsement, still some rights of the parties, after the note is discounted, are to be controlled by its date,

and not exclusively by the time of the endorsement. For instance, if the note be payable ten days after date, and should be discounted three years and twenty days afterwards, when would limitations begin to run? Would it be from the time it fell due by the terms of the note, or from the endorsement, because it only then ceased to be blank paper, and became an effective note or cause of action? We imagine the statute would bar a recovery upon any suit commenced more than three years after the time prescribed in the note for its payment, no matter when discounted. And still it is a general rule, that limitation does not commence until there is a cause of action. If we are right in reference to the subject of limitations, the note, prior to endorsement, is not blank paper in every respect. And if the date may be regarded as regulating the subject just referred to, why may it not likewise be considered as having an effect, if not otherwise, by relation from the endorsement, when the question is, as to whether a voluntary conveyance is void against creditors?

Again, if such a note as we are considering is executed and not discounted until after the maker's decease, can it be doubted that it is his note, and a valid claim against his estate? Will it be seriously contended, that because it had no legal efficacy until after the maker died, the negotiation after the death could not then give the note vitality, so as to create a claim against a dead man, when that claim was nothing more than blank paper during his life? We suppose the appropriate response to such questions would be, that the note created no liability from the maker to the payee, but its execution imposed upon the former a contingent liability to whoever might become an indorsee thereof for value. And when the note is discounted, the contingent responsibility is rendered absolute, and, as between the maker and endorsee, it will be regarded as a valid claim from its date against the former.

Formerly the claim of an accommodation indorser or other surety, was not one which he could prove under a proceeding in bankruptcy or insolvency against the principal; and for that reason the former could sue the latter after paying the original claim subsequently to the discharge of the latter. At least

such was the law in England and in Maryland, until changed by recent legislation.   The doctrine on which the former decisions were based, is, that the surety had  only a contingent or possible claim, which was not a *debt* until  it became one by his paying the original claim for the principal.

Notwithstanding this, still we find the authorities holding, that when the question is, whether a voluntary conveyance is void as to creditors, the contingent claim of a surety against his principal, the grantor, will be considered as having the effect of an antecedent debt.

In 1 *American Leading Cases,* 57, *(Ed. of* 1847,) it is said, "The statute, 13 *Elizabeth, ch.* 5, protects creditors and *others;* and a liberal construction in allowing to persons who are or might be injured by a fraudulent conveyance, the character of creditors under this statute, has always prevailed.   As to rights from contracts, any one liable upon a contract, express or implied, though only contingently, is a debtor from the time that the liability is entered into; accordingly, a surety is a creditor of the co-obligor or co-sureties, from the time that the obligation is entered into; and those interested in an official bond, are creditors of the surety from the time that the bond is executed by him; the guarantee of an assigned judgment is a creditor of the guarantor from the time that the guaranty is given."   Several cases are referred to in their notes, in support of what the authors have thus said.

In Pennsylvania, it has been held that a grantor's liability as accommodation indorser, may be used to show indebtedness at the time of a conveyance alleged to be fraudulent, though the note was not then dishonored.   4 *Barr.,* 178, *Hamet vs. Dundass.*

The defendants have contended, that although the notes of the 30th of July 1844, are dated prior to the deed, still, being accommodation notes, they, or at least such of them as were discounted when over-due, and with notice of the deed to the indorsees, cannot be used to impeach that instrument.   It is, however, well settled, as may be seen in *Renwick vs. Williams,* that accommodation notes may be negotiated when over-due. It is true, they are to be taken subject to certain equities of the

maker, but their being accommodation notes is not, of itself, a defence against them in the hands of the indorsees. And, in regard to notice of the deed, it may be said, if the indorsees had knowledge of its existence, they likewise knew it was executed after the date of the notes.

Considering the language and design of the statute of *Elizabeth*, and the authorities in regard to the present question, we think the claimants upon the notes dated anterior to the deed, although discounted subsequently, whether before or after maturity, should be regarded in the light of antecedent creditors. But in reference to the effect of those claims upon the deed, it is a matter of little importance whether they are held to be antecedent or subsequent.

If a voluntary conveyance is made with a view or expectation of becoming subsequently indebted, and, in accordance with such view or expectation, debts are contracted, those who thus become creditors may avoid the deed, although their claims had not, at its date, even a contingent existence. 1 *Amer. Lead. Cases*, 55; *Parish, et al., vs. Murphree, et al.* 13 *How. S. C. Rep.*, 99.

On account of the following claims, exclusive of any others, we think the deed of 1844 may be held void:

H. C. Elion's note of the 2nd of July 1844, and
the judgment upon it,    -    -    -    -    $350 00
Mills' note, dated the 30th of July 1844,  -    -    300 00
Renwick's note, same date, for $2,000, reduced by
usury to  -    -    -    -    -    -    -    1,306 12
Banks' note, dated the 30th of July 1844, Exhibit
D.B.B., No. 1, or No. 5,  -    -    ..    -    2,000 00

                                            $3,956 12

Elion's was certainly an antecedent debt. And the three notes, dated the 30th of July 1844, although accommodation notes, and negotiated subsequent to the deed, still they may be used to avoid it. For only three days before its execution, these notes were given by Mrs. Chase to her grandson. Knowing, as well as she did, from sad experience, his pecuniary condition and his general habits, it is not possible she

could have entertained the least hope that he would not trans-
fer the notes, or that he would ever take them up, after they
had been transferred. She, therefore, must have executed
the conveyance with the confident expectation of being re-
quired to pay these notes.

The annual value of Mrs. Chase's *whole estate*, at the date
of the deed, according to the estimate of the defendant's own
counsel, as set forth in their statement, amounted to $4137.17,
after deducting but $200 for her support. If the deed should
be held valid, then her life-interest in the property thus esti-
mated, and but one-half of the rent of the lot called "New-
ington," and one-half of the ground-rent of $43.50, after her
decease, constituted all the means retained by her, after exe-
cuting the deed, with which the above stated claims were to
be paid.

When the means of paying such an amount of claims were
to depend, in a very great degree, upon the life interest of Mrs.
Chase, then over ninety years of age, in property, the esti-
mated annual value of which exceeds the claims but a mere
trifle, we cannot consider her as being, at the date of the con-
veyance, in such prosperous circumstances that her settlement
should be regarded as a reasonable provision for her family, in
her then condition, leaving no reasonable doubt of her still
possessing ample means to pay all claims, for the payment of
which she was bound to make abundant provision.

The Bible informs us that "The days of our years are three
score years and ten; and if by reason of strength they be four
score years, yet is their strength labor and sorrow; for it is soon
cut off, and we fly away." The great uncertainty of life, is
necessarily much increased at ninety; and if this deed should
be sustained, it would be virtually allowing Mrs. Chase, at that
advanced age, to make her creditors insurers of her life, with-
out their consent.

Although she lived some four years after making the deed,
and, during that period, her life-estate may have yielded suf-
ficient funds to have paid all her debts, and the liabilities for
which she was bound to make ample provision at the date of
the deed, still that instrument cannot be relieved from the effect

of the imputation of fraud at its date, in regard to those debts and liabilities, if they have not been actually paid; and it is not alleged they have.

All the judges sitting in this case concur in what has been said thus far. What follows, in relation to the rights of subsequent creditors, only expresses the views of the judge by whom this opinion is written.

The deed being declared void, on account of the claims which have been specified, it becomes necessary to ascertain whether the creditors whose claims originated after the date of the deed, can come in.

Upon careful examination of the authorities, and due consideration of the statute, I think that whenever a voluntary deed is held to be void, because fraudulent as to creditors, either for actual fraud or on account of the legal inference of fraud in the absence of proof showing a fraudulent intention, subsequent creditors will be let in, although there may not have been fraud in fact as to them.

In *Richardson vs. Smallwood*, 4 *Cond. Eng. Ch. Rep.*, 265, *(Jacob*, 552,) it is said by Sir Thomas Plumer, as Master of the Rolls, "If it be once shown that it is a deed which, as against any of the creditors, cannot stand, then the property becomes assets, and is applicable to the payment of debts generally; and all the creditors come in at whatever times their debts may have arisen. That is decided."

In *Reade vs. Livingston*, whilst giving his views in reference to the rights of subsequent creditors, Chancellor Kent thinks they are let in only in particular cases, but in enumerating such particular cases, he states one to be, "where it is requisite to interfere, and set aside the settlement, in favor of the prior creditor." He refers to the note in 12 *Ves.*, 156, as showing that in *Montague vs. Lord Sandwich*, Lord Rosslyn held, that if a settlement be affected as fraudulent against creditors who were such at its date, the subject is thrown into assets, and all subsequent creditors are let in.

This portion of the Chancellor's opinion was not under consideration in our Court of Appeals when they refused to adopt his doctrine, that the inference of fraud arising from the mere

fact of indebtment, is sufficient to invalidate a voluntary deed at the instance of a subsisting creditor, without regard to the grantor's means of paying.

In *Iley vs. Niswanger*, 1 *McCord's Ch. Rep.* 518, the second question considered by the court is, whether a voluntary transfer, if not void as to subsequent creditors, yet if set aside in favor of subsisting creditors, shall be held void *in toto*, so that subsequent creditors may be let in? In reference to this question the court say: "But the decree may be supported on the second ground. Chancellor Kent, in the case above alluded to, lays it down as a settled rule, that when a deed is set aside by prior creditors, subsequent creditors are entitled to come in." The court then refer to what has already been stated as having been held by Lord Rosslyn in *Montague vs. Lord Sandwich.*

On *page 523, of* 1 *McCord*, it is decided, and I think correctly, that notice of the conveyance to a subsequent creditor, will not prevent him from coming in, because when once the deed has been set aside as fraudulent, so far as creditors are concerned, it is as though it never existed, consequently notice to the creditor can make no difference.

It is true that the correctness of the note in 12*th Ves.*, 156, as to the opinion of Lord Rosslyn in regard to subsequent creditors being let in, is questioned by Judge Story, in his 1*st Vol. of Equity Jurisprudence, note* 2 *to sec.* 361. The reporter, however, not only states what was the opinion but adds, "This was clearly held by Lord Rosslyn in *Montague vs. Lord Sandwich.*" This statement of the reporter is treated as correct by Chancellor Kent in *Reade vs. Livingston*, 498, as also by the court of South Carolina in *Iley vs. Niswanger*, 522.— And although Mr. Atherly *(Marr. Sett., marg. page* 213, *note* 1, *in* 27 *Law Lib.*,) disputes the soundness of the decision, he does not even intimate a doubt, as to its being correctly reported in the note. The case it seems is nowhere reported at large, but was decided in July 1797.

The doctrine contained in this note is adopted by the Chancellor in 2 *Bland's Rep.*, 35, *Kipp vs. Hanna.* He refers to the note, with other cases, as sustaining him in saying, "But it has also been long well established, that where a voluntary

conveyance has been vacated for the benefit of those who were creditors at the time, all subsequent creditors may be let in to participate of the funds." In that case the Chancellor let in the subsequent creditors, although he held that they, alone, could not have originated and sustained a bill for vacating the deed. If, on this point, he is to be understood as holding that, under no circumstances, subsequent creditors can originate and sustain a bill for vacating a voluntary deed, I do not concur with him.

In *Ingram vs. Phillips*, 5 *Strobhart's Rep.*, 206, the court say, "The law certainly is, that one who is not indebted may give away his property, and that the gift shall be valid against the donor and all persons. But if the donor be indebted beyond his means of payment, the gift is a fraud against his creditors, and void as to them. In such case, even if no dishonest intention can be imputed to the donor, the gift will be set aside in favor of creditors. If it be void against prior creditors, it is void as to all creditors; for by the fraud against some, the gift is void as to all. When a person is indebted, having made a voluntary deed, the property shall still be considered a part of his estate. If a deed is fraudulent as to subsisting creditors, the subject is thrown into assets, and all subsequent creditors are allowed to participate in the distribution."

In *Thompson vs. Dougherty*, 12 *Serg. & Rawle*, 458, it is said: "The law making the settlement void as to antecedent debts, lets in the subsequent creditors on the estate conveyed. If the settlement is void as to one set of creditors, it is void as to all." See, also, *Walker vs. Burrows*, 1 *Atk.*, 94. *Ede vs. Knowles*, 2 *Younge & Collyer N. R.*, 172, 178.

It has been supposed that our registration laws should produce some change in the principles regulating the rights of subsequent creditors, as those principles were first established in England when no general registration laws there prevailed. But such laws exist in most, if not in all, of our sister States, and yet no decision in any one of them has been cited, tending to show that such laws, upon the ground of notice, or on any other grounds, should be considered as rendering it proper to change, or in anywise to modify or alter the principles relating

to the rights of *subsequent creditors*, which are recognized in the English and American authorities, which have been referred to on this subject.

These authorities are very decidedly in favor of the right of subsequent creditors to be let in, whenever a voluntary conveyance is set aside at the instance of creditors who are entitled to a decree for that purpose. And this, upon principle, would seem to be the proper construction of the statute. It has long since been correctly held that the *Statute of 13th Elizabeth* does not extend to voluntary conveyances, merely as such, but only makes them void as to creditors, when fraudulent. Any instrument, therefore, which, under the provisions of the statute, is void as to creditors, must be fraudulent. The courts have drawn a distinction between fraud in law and fraud in fact. Either, however, under some circumstances, will avoid a voluntary deed; but still, in every case when held to be void, it is so because fraudulent, within the meaning of the statute; the design of which is to prevent any such instrument from operating injuriously upon the creditors of the grantor. In providing for their protection, the language is general. It certainly is not restricted or limited by any particular or special allusion to those who may be such at the time of the transaction. When, therefore, at the instance of creditors, a deed is held to be void, in regard to them, because fraudulent in law, although it may not be so in fact, still it is rendered void because the statute denounces such conveyance as fraudulent against *creditors*. And if void because fraudulent as to some, the general language of the statute would seem to make it so in regard to all. This interpretation is advocated by *Mr. Atherly, marg. pages* 215 to 218. But by referring to him as authority for such a construction, I do not adopt his views, in holding that mere indebtedness at the time of the conveyance, without regard to the amount of the property conveyed, and the ability of the grantor to pay his debts, will render a voluntary deed void, as fraudulent against prior and subsequent creditors also. Such doctrine is at variance with the decision in *Worthington & Anderson vs. Shipley*. When, however, according to the principles of that case, the debts

and the condition of the grantor are such as to render his deed void, it is held void because it does, or may, hinder and delay creditors. Should these debts remain unpaid until the decease of the grantor, and in the meantime other debts are contracted, and the estate, exclusive of the property conveyed, is insufficient to pay all, (as is the fact in the present case,) surely the subsequent creditors are creditors hindered and delayed by virtue of the deed, contrary to the spirit and design of the statute. Why then should they not be let in under a proceeding at the instance of creditors for setting aside a conveyance, declared by the statute void against *creditors,* without specifying any particular class of them, other than such as "might be in anywise disturbed, hindered, delayed or defrauded?"

A majority of the court, however, think the subsequent creditors, in this case, are not entitled to come in, although the deed is declared void; it is, therefore, unnecessary for me to examine the various reasons which have been urged by the appellants, why the subsequent claims before us should be excluded, even were this a case in which subsequent creditors, having valid claims, might be let in.

I think with my brethren, that, without reversing or affirming the decision below, the case should be sent back for further proceedings, under the act of 1832, ch. 302.

*By Chief Justice* LE GRAND *and Justice* TUCK :

We assent, for the most part, to the opinion of our learned brother. He has very fully and accurately defined the law applicable to the very many questions involved in the case, in all of which, with but a single exception, we fully concur. We dissent, however, from that portion of the opinion which recognizes the right of the creditors, who became so subsequently to the execution of the deed to the Messrs'. Williams, to come in for a distributive share of the assets of the estate conveyed by that instrument.

We do not deem it necessary to review the cases which sanction the doctrine announced by our brother: it is sufficient we should acknowledge that they sustain it fully. But, in our opinion, those cases are not binding on us, and are in

32    v. 11.

direct conflict with the policy and operation of our registration acts. The whole seems to be deduced from a *dictum* of Lord Hardwicke, in *Walker and others vs. Burrows*, 1 *Atkins*, 93, and another case in England, at a time when there was no registration system in existence in that country. We have no doubt that subsequent creditors, where there is fraud *in fact*, have a right to come in; but we cannot comprehend how a person who, at the time of becoming a creditor, is aware of the existence of a deed, can, in any just sense, be considered as "disturbed, hindered, delayed or defrauded," by it. It seems to us to be a contradiction in terms to say, that a person is defrauded by an instrument when he deals with a perfect knowledge of its existence and of its effect. If our registration laws have any operation, they certainly do, as they were designed, give notice to all the world, so that there may be no deceit practiced upon any one. If registration laws do not give notice to the community which will bind it, then they are of no use whatever, for without registration deeds would be binding *inter partes*. In the case of the *Mayor & City Council of Balto. vs. Williams*, reported in 6 *Md. Rep.*, 235, Baltimore county court sustained this very deed, in opposition to the English construction placed upon the *Statute of 27th Elizabeth*, on the ground that the registry acts of this State imputed to the second grantee notice of the first deed, and that he could not be said to have been defrauded. We do not perceive why the same doctrine should not apply to the *Statute of 13th Elizabeth*. Although this court did not deem it necessary, in words, expressly to affirm or reject this part of the opinion of the county court, we entertain no doubt that if the decision of the case had required it, the doctrine would have been fully sustained.

The English doctrine, if applied here, would (as was said in that case of purchasers) permit a subsequent creditor to be *knowingly* instrumental in disappointing just and honest expectations, based upon a voluntary deed or settlement, unaffected by the slightest fraud, in fact, at the time of its execution.

The view which we have taken, we believe, is supported by the language of the statute, and in conformity with the

principles of justice, and inasmuch as we are not trammelled by any decision of the Court of Appeals of this State, we feel at full liberty to pronounce it as the law, as it should be in fact, with us. In confirmation of the right reasoning on which it rests, we refer to *Section* 361 *of the* 1*st Volume of Story's Equity Jurisprudence.*

In these observations we wish to be understood, not as denying the right of subsequent creditors to invalidate a fraudulent deed when made with the intention and design to defraud those who should thereafter become creditors. Such creditors would be in the same condition as those whom we have referred to as having the benefit of the principles governing cases in which there is actual fraud. In this case, however, we do not believe there was any intention on the part of Mrs. Chase to commit any fraud whatever, on existing or subsequent creditors. We concur with our brother in returning the case to the circuit court, under the act of 1832, so that the rights of parties may be definitively settled, according to this and his opinion.

*Cause remanded, under Act of* 1832, *chap.* 302.