ARTHUR WASHBURN *v.* MARY E. BLUNDELL ET AL.

1. PRINCIPAL AND SURETY. *Exemptions. Homestead. Laws* 1852, *p.* 66. *Code* 1857, *art.* 281, *p.* 529.

   The rights of the widow and children to the homestead of a deceased principal maker of a promissory note who died in 1858, as against the demand of the surety thereon, the note having been made in 1855 and paid by the surety after the death of the principal in 1858, is determined by the law of 1852 (laws 1852, p. 66), and not by the code of 1857; said code expressly provided that the laws then in force respecting the exemption of real estate from execution, should apply to all contracts made and liabilities incurred before the code took effect. Code 1857, art. 281, p. 529.

2. SAME. *Liability of principal to surety, when incurred.*

   The liability of a principal in a promissory note to his surety thereon is incurred when the note is given, and not at the time the surety pays the same.

FROM the chancery court of Yazoo county.

HON. H. C. CONN, Chancellor.

The opinion states the case.

*McLaurin & McKnight*, for appellant.

Was the "liability incurred" by the principal, Pugh, to the surety, Washburn, at the time of the making of the note by Pugh and Washburn to Hamer, or was the "liability incurred" by Pugh, the principal, to Washburn, surety, at the time of the payment of the note by Washburn, the surety? This question involves a construction of the "proviso" to art. 281, p. 529, of the code of 1857, which reads as follows: "*Provided,* That the laws now in force, respecting the exemption of real estate from execution, shall apply to all contracts made and liabilities incurred before this act shall take effect," and the expression in the body of said article, as follows: "Entitled to hold, exempt from seizure and sale under any execution,

judgment or decree, founded on any contract made or liability incurred after this act shall take effect.''

Under this article there are two separate and distinct sources from which the execution may emanate: First, from a contract made; and, second, from a ''liability incurred.'' The term ''contract made'' has reference to a contract upon which suit may be brought and a judgment or decree obtained. The word ''liability'' is defined by Anderson, in his law dictionary, to be ''that condition of affairs which gives rise to an obligation to do a particular thing to be enforced by action.'' *Haywood* v. *Shrives*, 44 N. Y. L., 104 (1882); *Wood* v. *Curry*, 57 Cal., 209 (1881). And by Bouvier, in his law dictionary, as follows: ''Liability is responsibility; the state of one who is bound in law and justice to do something which may be enforced by action.'' *McElfresh* v. *Kirkendall*, 36 Ia., 226. The word ''incur'' is defined by Anderson as follows: ''Men contract debts affirmatively; they incur liabilities—the liability is cast upon them by act or operation of law.'' ''Incur'' implies, then, something not embraced in the words ''debts and contracts.'' *Crandall* v. *Bryan*, 15 How. Pr., 56 (1857); 5 Abb. Pr., 169; 14 Barb., 202; 4 Duer, 101; and the word is defined in 10 Am. & Eng. Enc. L., 398, as follows: ''To become liable or subject to.'' *Scott* v. *Tyler*, 14 Barb. (N. Y.), 204. Men contract debts; they incur liabilities. In the one case they act affirmatively, in the other the liability is incurred or cast upon them by operation of law. The words ''liability'' and ''incurred,'' as defined above, should be taken not separately, but together as one phrase, ''liability incurred,'' in order to get the proper meaning of the statute under consideration. And thus taken, the expression, ''liability incurred,'' is synonymous with ''cause of action,'' as distinguished from ''right of action;'' and ''cause of action'' is defined by Anderson as ''the right which a party has to institute and carry through a proceeding.'' Article 281, p. 529, of the code of 1857, speaks in the past tense, and contemplates and has ref-

·erence to "liabilities incurred" "before" its passage, or "causes of action" already existing, and upon which the right "to institute and carry through a proceeding" existed at the time of its enactment. In other words, a liability which was absolute, and by which the relation of debtor and creditor then existed between the parties at the time of the enactment of the code of 1857; that is, liabilities already incurred, and upon which suit might then, at the enactment of the code of 1857, be brought.

Next, the questions arise: (1) When did the "cause of action" arise in favor of the surety against the principal? (2) When did the relation of debtor and creditor arise between them? (3) When did the liability become absolute? (4) When was the "liability" incurred by Pugh to Washburn? (5) Did these things happen at the time of the making of the note or at the time of its payment by the surety? It may be contended, on the part of the appellees, that a conditional, contingent, implied liability on the part of the principal to reimburse the surety arose at the time of the making of the note. This is as far as this court has ever gone towards holding that the relation of debtor and creditor existed between principal and surety before payment, but, it must be remembered, that the cases in which this conditional, contingent, implied liability is held to exist before payment (*May* v. *Williams*, 61 Miss., 133, and *Loughridge* v. *Bowland*, 52 Miss., 546) are cases passing upon this relationship as within the statute of frauds, which is one of the two exceptions to the general rule that the surety is not the creditor of the principal until after payment, the other exception being the right to maintain *quia timet* bills before payment. *Lee* v. *Griffin*, 31 Miss., 632; *Bank of England* v. *Tarleton*, 23 *Ib.*, 173; *Pennington* v. *Seal*, 49 *Ib.*, 518.

In *Loughridge* v. *Bowland* this court declined to say whether, in that particular case, the relation of debtor and creditor existed at the date of a certain deed, but held that

"whether the surety is esteemed the creditor of the principal from the date of his suretyship, or the date of the payment of the debt, depends very much on the character of the remedy or redress which he may seek." The case of *May* v. *Williams*, above, on which much reliance is placed by appellees, decides no more than had already been held in *Pennington* v. *Seal* and *Loughridge* v. *Bowland*, above, except that it does hold that the relations of debtor and creditor do not arise between principal and surety until payment by the surety, and the utterances therein contained, with this exception, have reference entirely to principal and surety as within the exception, the statute of frauds. But a conditional, contingent, implied contract does not fill the measure of the statute, which says "liabilities incurred," for the following reasons: (1) The condition of such implied contract is a condition precedent, and is one which must happen before either party becomes bound by the contract [Anderson's Law Dic., 222]; (2) the word "contingent" implies that no present right exists, that whether a right ever will exist depends upon a future, uncertain event. Anderson's Law Dic., 245; *Jamison* v. *Blowers*, 5 Barb., 692; *Haywood* v. *Shreves*, 44 N. Y. L., 104. Under such conditional, contingent, implied contract no right existed at the time of the enactment of the law of 1857, because the surety had not then paid, and therefore there was no "liability incurred" by the principal to the surety before the act of 1857 took effect. No "cause of action" arose in favor of the surety against the principal until payment by the surety, because the surety cannot recover from the principal the debt for which he is surety before payment, and the fact that the surety has no such remedy against the principal is due to the fact that there is no "liability incurred" by the principal to the surety before payment. *Lessley* v. *Phipps*, 49 Miss., 790. The relation of debtor and creditor, between them, does not exist before payment by the surety.

*Williams & Williams* and *Barnett & Thompson*, for appellees.

The question presented is not a novel one. It has been decided by many courts in many cases, and always in one way, so far as we know. In *May* v. *Williams*, 61 Miss., 125, Cooper, J., said, in speaking of the principal's liability to indemnify the surety, as existing before payment by the latter, that it was an implied contract, made by the principal with the surety, the promise being to the latter as to a creditor, not a debtor. He said, further: "Nor are we able to perceive that the contract of the promisee [surety] is anterior to that of the principal in the bond. Until the surety assumes responsibility by executing the bond, the agreement of the promisor to indemnify is only a proposition, which may be withdrawn by him or declined by the promisee. It is only when the proposition is acted on by the promisee that the contract becomes absolute; but at the very instant that it thus becomes a contract, there also springs up an implied contract of the principal to do and perform the same act, viz., to indemnify the surety against the loss. It arises at the same moment, exists to the same extent, is supported by the same consideration, broken at the same instant, and is discharged by the same act, whether it be done by the principal in the bond or by the promisee in the contract to indemnify."

It would be hard to imagine clearer or stronger language, and by it this court is committed to the doctrine for which we contend. Yet the same proposition had frequently before been announced by this court in language no less clear. In *Loughridge* v. *Bowland*, 52 Miss., 546, Simrall, C. J., in discussing the question whether a surety, before payment of the debt, was a creditor, within the meaning of the statute, against fraudulent conveyances, and answering it in the affirmative, said: "When Bowland became bound as surety, there sprang up at once the contingent liability to him, on the part of Chears, that if he paid the debt, then Chears would indemnify or reimburse. The contingent undertaking became absolute on the act of pay-

ment, but it existed all along." *Pennington* v. *Seal*, 49 Miss., 518.

The language of other courts is to the same effect. In *Rice* v. *Southgate*, 16 Gray, 142, Bigelow, C. J., said: "Upon well-settled principles it is clear that the contract of a principal, with his surety to indemnify him for any payment which the latter may make to the creditor in consequence of the liability assumed, takes effect from the time when the surety becomes responsible for the debt of the principal. It is then that the law raises the implied contract or promise of indemnity. No new contract is made when money is paid by the surety, but the payment relates back to the time when the contract was entered into by which the liability to pay was incurred. The payment only fixes the amount of damages for which the principal is liable, under his original agreement to indemnify the surety." And in *Beach* v. *Boynton*, 26 Vt., 734, Redfield, C. J., said: "There is really a right to be indemnified on the part of a surety, and a duty on the part of the principal to indemnify, as if it were in the form of a bond. . . . And if necessary, for any purpose, to show the date of his claim, he may declare upon his implied duty or promise to save harmless, which is certainly recognized in the elementary writers upon this subject, and in most of the cases," citing authorities.

The argument of appellant's counsel rests to a large extent upon the numerous decisions of this court in which it was held that the surety's right of subrogation to the rights of the creditor arose, as matter of natural equity, upon payment of the debt by him, from which counsel appeared to deduce the proposition that all the surety's right began with such payment. The surety's rights are broader, and begin with the very contract of suretyship itself. In the nature of things the surety cannot have either a right of action or equitable right to subrogation until he pays, but the cases cited prove that his inchoate right to both exists even before payment. Counsel's mistake is in confounding these remedial rights with the orig-

inal contract of indemnity, for the breach of which both are given. Of necessity they rest upon the breach, but of equal necessity the breach implies an anterior contract or promise. And if the extent of the surety's "natural equity" is the mere right of subrogation to the creditor, then, indeed, is the appellant hopelessly lost, for the note itself was certainly a contract made, and represented a liability incurred prior to the code of 1857, and no holder of it, by subrogation or otherwise, can overcome the homestead right in fee given by the law prior to November 1, 1857. If the holder of that note, then, is unable to subject the homestead, it would be a strange anomaly if the surety thereon, or his representative, could do so. It would be a curious result if his claim for reimbursement merely, without subrogation, should be broader than the "natural equity" claimed for him by counsel.

WHITFIELD, J., delivered the opinion of the court.

On April 8, 1855, W. E. Pugh, as principal, and A. W. Washburn, as surety, executed a promissory note to one Hamer, trustee of the Yazoo county school fund, for $450, payable on January 1, 1856. Pugh kept the interest paid up to January 1, 1857, and on March 8, 1858, died intestate. On May 17, 1858, Washburn paid the note, and then, on May 18, 1858, probated it against Pugh's estate, which was declared insolvent, but which has not yet been finally administered.

At the time of Pugh's death he owned a homestead in Yazoo City, and left a wife and three children, minors, surviving him. The widow occupied the homestead till her death. The youngest child has come of age. And this is an effort by the surety to subject to sale, for the satisfaction of his said claim, such homestead. The petition was demurred to, and the demurrer sustained. Under the law in force when the note was executed (acts of 1852, called session, p. 66), the homestead of a decedent descended to the widow and children during widowhood, and, after the widow's death, to all children, share and share

alike, free from the debts of the husband, or of the widow during her widowhood. But the code of 1857, which went into effect November 1, 1857, limited the right of the widow and children to occupancy of the homestead until the death of the widow and the arrival at age of the youngest child, adding this provision: "*Provided*, That the laws now in force respecting the exemption of real estate from execution, shall apply to all contracts made and liabilities incurred before this act shall take effect." Code of 1857, art. 281, p. 529. It is obvious, therefore, that if appellant's rights are governed by the acts of 1852, *supra*, he should fail, otherwise he should not. And the sole question to be determined is, whether the liability of the principal, Pugh, to repay the surety the amount paid by him to the holder of the said note was incurred, within the meaning of the proviso to article 281 of the code of 1857, *supra*, when the said note was executed, or when the payment was made; or, to state the question a little differently, is the surety the creditor of the principal from the execution of the note, or from the date of payment by him of the note? It is to be noted, in passing, that the petition does not show when the homestead was acquired, whether before or after the code of 1857, but we deem that immaterial. We understand this court to be committed to the doctrine, manifestly the correct one, that the surety is such creditor from the time of the execution of the note. It is so expressly stated in *Pennington* v. *Seal*, 49 Miss., 525, adopting *Williams* v. *Bank*, 11 Md., 242, and 1 Am. Lead. Cas., 57, both so holding. To the same effect are *May* v. *Williams*, 61 Miss., 133, and *Loughridge* v. *Bowland*, 52 *Ib.*, 557. In *Rice* v. *Southgate*, 16 Gray, 142, a case like this, involving the application of the principle to an effort to subject a homestead, when the law had undergone change, the court say: "Upon well-settled principles it is clear that the contract of a principal with his surety to indemnify him for any payment which the latter may make to the creditor, in consequence of the liability assumed, takes effect from the time when the surety becomes

responsible for the debt of the principal. It is then that the law raises the implied contract, or promise of indemnity. No new contract is made when the money is paid by the surety, but the payment relates back to the time when the contract was entered into by which the liability to pay was incurred. The payment only fixes the amount of damages for which the principal is liable under his original agreement to indemnify the surety." We adopt this as an admirable statement of the law. The same principle, in language equally strong, is laid down by the learned Chancellor Cooper in 2 Tenn. Chy. Rep., 555, 556, the court saying: "The obligation created by the act of becoming surety subsists from the moment it is entered into, and the fact that the statute of limitations only begins to run between the parties from the payment of the security debt no more changes its character, or the date of its commencement, than the fact that the statute does not begin against a creditor who takes a note of the testator upon long time, till the debt falls due. . . . And obviously it is a mere play upon words to say that such a liability is not a debt or obligation created in the lifetime of the principal, since it originates in the execution of an instrument by the principal and surety, and flows from a principle of equity so universally acknowledged that, in the language of Lord Eldon, those who act under it 'may properly be said to act under the head of contract.'" To the same effect are *Miller* v. *Stout*, 5 Del. Chy. Rep., 262, *et seq.; Martin* v. *Ellerbe's Adm'r*, 70 Ala., 335; 24 Am. & Eng. Enc. L., 774, 775, with authorities, and 1 Brandt on Suretyship & Guaranty, sec. 207. The views of the learned chancellor below were in accord with these authorities, and the decree is

*Affirmed.*